**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq.
Laurence M. Rosen, Esq.
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JEREMY VANDERSLUIS, Individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>        v.<br><br>AGILON HEALTH, INC., STEVEN SELL, and JEFFREY SCHWANEKE,<br><br>        Defendants. | **Case No:**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff Jeremy Vandersluis ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding agilon health, inc. ("agilon", "Agilon", or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1

## NATURE OF THE ACTION

1.    This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded agilon securities between February 26, 2025 and August 4, 2025, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendant's violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5.    In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.    Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased agilon securities during the Class Period and was economically damaged thereby.

7.      Defendant agilon's principal executive offices located at 440 Polaris Parkway, Suite 550, Westerville, Ohio. Agilon has subsidiaries in New York and conducts business in New York. The Company's common stock trades on the New York Stock Market (the "NYSE") under the ticker symbol "AGL".

8.      Defendant agilon describes itself as the "trusted partner empowering physicians to transform health care in our communities."

9.      Defendant Steven Sell served as the Company's Chief Executive Officer, President, and as a director on the Board of Directors (the "Board") from the beginning of the Class Period until August 4, 2025.

10.     Defendant Jeffrey Schwaneke ("Lucas") served as the Company's Chief Financial Officer at all relevant times.

11.     Defendants Sell and Schwaneke are collectively referred to herein as the "Individual Defendants."

12.     Each of the Individual Defendants:

   (a)    directly participated in the management of the Company;

   (b)    was directly involved in the day-to-day operations of the Company at the highest levels;

   (c)    was privy to confidential proprietary information concerning the Company and its business and operations;

   (d)    was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)    was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)    was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)    approved or ratified these statements in violation of the federal securities laws.

13.    Agilon is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

14.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

15.    Agilon and the Individual Defendants are collectively referred to herein as "Defendants."

<u>**SUBSTANTIVE ALLEGATIONS**</u>
**Materially False and Misleading Statements**
<u>**Issued During the Class Period**</u>

16.    On February 25, 2025, at market close, agilon issued a press release entitled "agilon health Reports Fourth Quarter and Full Year Fiscal 2024 Results." (the "Q4 Release")

17.    The Q4 Release stated that agilon's "[f]ull year ***2025 guidance reflects the positive impact from strategic actions*** and assumes continued elevated medical cost trends; Class of 2025 expected to add approximately 20,000 Medicare Advantage members."

18.    The Q4 Release gave the following guidance for the full 2025 year:

- Respective low and high ends of 490,000 or 520,000 Medicare Advantage Members;

4

- Respective low and high ends of 105,000 and 115,000 ACO Model Members;

- Respective low and high ends of 595,000 or 635,000 Total Members Live on Platform;

- Respective low and high ends of 489,000 and 516,000 Avg. Medicare Advantage Members;

- Total Revenues of (in millions) $5,825 to $6,025

- Medical Margin (in millions) of $275 to $325.

- Adjusted EBITDA (in millions) of ($95) to ($55)

19.     The statement in ¶ 17, and the guidance listed above in ¶ 18, were recklessly given to the market because they were unrealistic, given industry headwinds which were known to Defendants. The statement in ¶ 17 was additionally materially false and misleading when made because it recklessly overstated the positive impact from "strategic actions" taken by the Company.

20.     The Q4 Release quoted Defendant Sell as stating the following:

While the underlying strength of our model continues to deliver significant value to patients, payors, and our PCP partners, *we are still managing through a challenging Medicare Advantage environment*. As a *result of the strategic actions we have taken to reduce our underwriting risks, improve our platform capabilities, and maintain cost discipline we have established a stronger foundation for success*. Combined with continued market demand we remain focused on supporting our physician partners to deliver high-quality, cost-effective care to their senior patients while driving long-term sustainable financial performance

21.     The statement in ¶ 20 was materially false and misleading at the time it was made because Defendant Sell recklessly overstated agilon's ability to achieve positive financial results for 2025, in the face of known headwinds. Further, he recklessly overstated the effectiveness of actions taken by the Company to achieve positive financial results in a difficult business climate.

22.     On May 5, 2025, after market close, the Company held its earnings call for the first quarter of 2025 (the "Q1 Call").

23.     On the Q1 Call, Defendant Sell made the statement that the Company remained "**on track to deliver in line with our full year 2025 guidance**."

24.     The statement in ¶ 23 was materially false and misleading at the time it was made because Defendant Sell knew or should have known that the Company was not "on track" to meet its 2025 guidance, given material issues he was aware of. Further, Defendant Sell knew or should have known that, given the Company's business cycle, cost and risk controls implemented in 2024 would not have a positive impact on the Company until 2026.

25.     The statements contained in ¶¶ 17, 18, 20, and 23 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Defendants recklessly issued guidance for 2025 that they knew or should have known was not going to be achieved, given material industry headwinds of which they were aware; (2) Defendants materially overstated the immediate positive financial impact from "strategic actions" taken by agilon to reduce risk; and (3) as a result, Defendants' statements about agilon's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### THE TRUTH BEGINS TO EMERGE

26.     On August 4, 2025, agilon issued a press release entitled "agilon health Announces Leadership Transition."

27.     This press release stated that Defendant Sell "has stepped down as President, CEO, and a Director of the Board. Ronald A. Williams, the Company's co-founder and Board Chairman since 2017, has been appointed Executive Chairman. Williams is an industry veteran with

leadership experience at healthcare and technology companies including Aetna, where he was Chairman and CEO."

28.    Upon information and belief, Defendant Sell was essentially fired from the Company. On the same day that the Company issued the press release announcing his departure, the Company filed a current report on form 8-K with the SEC which stated that "Mr. Sell's departure was a termination without 'cause' under Mr. Sell's employment agreement[.]"

29.    Separately on August 4, 2025, agilon issued a press release entitled "agilon health reports Second Quarter 2025 results." (the "Q2 Release"). The release announced disappointing financial results.

30.    The Q2 Release quoted agilon's executive chair as stating the following:

agilon's value-based care model delivers significant value to our physician partners and their senior patients across the U.S. with a proven ability to serve as the long-term solution for practices focused on outcomes[.] We have continued advancing strategic initiatives in 2025 to improve performance – including enhancing our platform, data visibility, quality and delivery programs and contract economics – that we expect to fully realize the benefit of next year given the nature of our business cycle. Nevertheless, as we progressed through this transition year, ***it's become clear that the industry headwinds are more acute than previously expected, and our enhanced data platform is providing visibility that indicates our 2024 and 2025 risk adjustment is also lower than previously expected, which is impacting near-term results***. It is clear we need to further improve execution and more fully optimize agilon against broader market-based complexities.

31.    The Q2 Release further announced that the agilon was suspending its 2025 guidance, stating the following:

In conjunction with the announcement of agilon's leadership change and the evaluation of additional actions to optimize operating performance, as well as continued execution of ongoing initiatives and market uncertainty which may impact future results, agilon ***is suspending its previously issued full-year 2025 financial guidance and related assumptions.***

32.    Commenting on agilon's financial results for the second quarter of 2025, after market hours on August 4, 2025, Investing.com published an article entitled "agilon health stock

plunges after CEO steps down amid earnings miss." The article stated the following, in pertinent

part:

> [Agilon stock tumbled] after the company announced CEO Steven Sell has stepped down **and the firm reported disappointing second quarter results that fell short of expectations.**
>
>           *     *     *
>
> The leadership change [as discussed above], **coincided with concerning financial results for the second quarter of 2025. Total revenue decreased 6% to $1.39 billion compared to $1.48 billion in the same period last year.** The company reported a gross loss of $52 million, a significant deterioration from the $32 million profit in Q2 2024.
>
> Medical margin swung to a negative $53 million from a positive $106 million YoY, while adjusted EBITDA loss widened to $83 million compared to a $3 million loss in the prior-year period.
>
> **The company cited several factors for the disappointing performance, including $66 million in prior period development costs and a $48 million reduction in risk adjustment revenue for 2025.** Total membership on the agilon platform decreased to 614,000 as of June 30, 2025, representing a 5% decline from the same period last year.

33.      On August 4, 2025, after market hours, agilon held its Q2 2025 Earnings Call (the

"Q2 2025 Call").

34.      On the Q2 Call, executive chairman Ronald Williams stated the following about

how, given the "long-term nature of our business cycle," actions taken in 2024 (purportedly to

control costs and risk) would begin to contribute to the Company's performance in 2026, and not

in 2025, as investors were led to believe when the 2025 guidance was issued, stating the following:

> Given the long-term nature of our business cycle, we have not yet captured the full upside from these enhancements this year, **but are confident in realizing them in 2026.** Nevertheless, as 2025 progressed, the industry complexities and headwinds we believe agilon would face were more acute than previously expected. **And our execution was not adequate.** This resulted in the underperformance we reported.

35.      On this news, the price of Agilon stock fell $0.9349 per share, or 51.50%, to close

at $0.8801 on August 5, 2025.

36.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and the other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

37.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired agilon securities publicly traded on the NYSE during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

38.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

39.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

40.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

41.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

42.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

43. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- the Company's securities met the requirements for listing, and were listed and actively traded on the NYSE, an efficient market;

- as a public issuer, the Company filed public reports;

- the Company communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

44. Based on the foregoing, the market for the Company securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the common units, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

45. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I
### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
### Against All Defendants

46.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

47.     This Count asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

48.      During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

49.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

50.     Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or

dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

51.    Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Company's personnel to members of the investing public, including Plaintiff and the Class.

52.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

53.    Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

54.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

55.     By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's securities during the Class Period.

**COUNT II**
**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

56.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

57.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's business practices

58.     As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

59.     Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to

engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Company securities.

60.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)    declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)    awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)    awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: December 31, 2025          **THE ROSEN LAW FIRM, P.A.**

/s/ Phillip Kim
Phillip Kim, Esq.
Laurence M. Rosen, Esq.

275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*