**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq.
Laurence M. Rosen, Esq.
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com
Email: lrosen@rosenlegal.com

*Counsel for Lead Plaintiff*
*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re: Agilon Health, Inc. 2025 Securities Litigation* | Case No: 1:25-cv-07167-HG<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

# TABLE OF CONTENTS

**Pages**


I. NATURE OF THE ACTION ..... 1

II. JURISDICTION AND VENUE ..... 5

III. PARTIES ..... 5

IV. DEFENDANTS' FRAUDULENT SCHEME ..... 7

A. Agilon's Revenue Recognition Practices and RAF ..... 7

B. Medical Margin and EBITDA ..... 9

C. Medical Coding, RAF Scores, and CMS Audits ..... 12

D. Changes to the CMS-HCC Model: V28 Replaces V24 ..... 14

E. Agilon's Improper Medical Coding ..... 15

1. FE-1: Despite V28, "Pick Up the Same Amount of RAF" ..... 15

2. FE-2: The Worst Coding FE-2 Had Ever Seen ..... 19

3. FE-3: Drive RAF Scores as High as Possible ..... 22

4. FE-4: Coding Conflicted with National Guidelines ..... 25

5. FE-5: "Dinged" on Audits for Refusing to Up-Code ..... 27

6. FE-6: Operational Model Relied on Aggressive Coding ..... 29

7. FE-7: All they Cared About was Capturing More HCCs ..... 31

F. Heightened Public and Government Scrutiny of MA Coding ..... 34

G. Restated RAF Wipes Out Medical Margin and Adjusted EBITDA ..... 37

V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS ..... 38

VI. LOSS CAUSATION ..... 54

VII. ADDITIONAL SCIENTER ALLEGATIONS ..... 57

VIII. PLAINTIFFS' CLASS ACTION ALLEGATIONS ........................................................ 61

IX. CAUSES OF ACTION ........................................................................................ 64

X. PRAYER FOR RELIEF ........................................................................................ 67

XI. JURY TRIAL DEMANDED ................................................................................. 68

Court-appointed Lead Plaintiff HR & Sons LLC, and additional plaintiffs Shaji Nelson and Jeremy Vandersluis (together, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding Agilon Health, Inc. ("Agilon", "agilon" or the "Company"), and information readily obtainable on the Internet, as well as through interviews of former employees of the Company. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This is a class action on behalf of persons or entities who purchased the publicly traded Agilon common stock between February 26, 2025 and August 4, 2025, inclusive (the "Class Period"). Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").[1]

2. Agilon contracts with Medicare Advantage health plans (commonly referred to as "payors" but sometimes also referred to as "insurers") to provide medical services to senior citizens in exchange for a fee paid to Agilon for each health plan member covered by the contract. Agilon agrees to accept the obligation to pay for the medical costs associated with the covered Medicare Advantage patients. In exchange, a payor gives Agilon an undisclosed portion of the funds the

[1] All emphases are added unless otherwise indicated. All references to Agilon's stock price are ***not*** split adjusted for the Company's 1-for-25 reverse stock split on March 31, 2026, after the Class Period.

payor receives from the federal government's Centers for Medicare & Medicaid Services ("CMS"). In this way, payors offload to Agilon the financial risk of their patients' medical costs, while retaining a portion of the money paid by CMS.

3. To deliver the medical services to patients, concurrent with entering the payor agreements described above, Agilon enters into agreements with physician practice groups. To turn a profit, Agilon and its physician partners must spend less on medical care for Medicare Advantage patients than they receive from payors – a term Agilon refers to as "medical margin." (Physicians working with Agilon are partners in the sense that they contractually benefit from and share in medical expense reductions that increase Agilon's medical margin.) Conversely, if Agilon's patient medical expenses and/or patient utilization rates increase, Agilon's medical margin (and therefore its profit) shrinks or disappears entirely.

4. Medicare Advantage (commonly referred to as "MA") plans receive risk-adjusted payments from CMS based on the diagnosis codes of their enrollees and collect higher payments for enrollees with more serious or chronic health conditions.

5. When Agilon contracts with a Medicare Advantage plan, Agilon employees conduct the medical coding to submit to CMS to document whether the enrollees/patients qualify for risk-adjusted payments that would then be paid by CMS to the Medicare Advantage plan. A significant portion of this risk-adjusted payment is then passed along to Agilon. Agilon labels this risk-adjustment payment the Medicare Risk Adjustment Factor or "RAF" and capturing RAF is critical to Agilon's business model.

6. Given that a higher RAF score for a patient translated to Agilon recognizing greater revenue for that patient, Agilon was incentivized to inflate patient RAF scores. According to Agilon former employees, that is exactly what Agilon did. *See* § IV.E.

7. Former Agilon employees provide detailed accounts of how Agilon's Director of Healthcare Operations and Risk Adjustment instructed coders and auditors to "capture" diagnoses even the when the doctor/provider had not documented any such diagnosis. Similarly, Agilon instructed coders they had to accept provider entries even if unsupported or erroneous. The artificially inflated RAF scores resulting from this misconduct, artificially increased revenue generated from those patients.

8. Agilon's internal auditors complained to management that Agilon's coders were consistently failing their audits. A majority of the coders did not meet standards. The level of coding inaccuracies raised serious concerns internally, with a financial impact estimated at hundreds of millions of dollars. And, according to these former employees, the errors were almost entirely biased towards inflating RAF scores and higher compensation to Agilon.

9. One former employee described the situation this way, the Company was hemorrhaging money, leadership was under pressure, and the coding team was caught in the middle of conflicting expectations, unclear guidance, and a push for higher RAF scores that often conflicted with Centers for Medicare & Medicaid Services rules.

10. During the Class Period, Agilon's inflated RAF scoring resulted in artificially inflated RAF revenue, which directly caused Agilon's publicly reported financial results to be artificially inflated. Agilon highlighted the Company's significant medical margins (medical revenues minus the costs to treat patients) and adjusted EBITDA as a measure of Agilon's improving business prospects. None of this was possible without inflated RAF scores.

11. In the years prior to the Class Period, Agilon was able to get away with artificially inflating its RAF scores because CMS had fallen years behind in its audits of Medicare Advantage payors/insurers, and then only audited a small fraction of the MA payors/insurers in the system.

That all changed in May 2025.

12. On May 21, 2025, CMS issued a press release titled "CMS Rolls Out Aggressive Strategy to Enhance and Accelerate Medicare Advantage Audits." According to CMS, Medicare Advantage plans had been overbilling the government by an astounding $17 billion to $43 billion per year. CMS would immediately commence taking its audit responsibilities much more seriously. CMS was "committed to crushing fraud, waste and abuse" and would increase audits from approximately 60 Medicare Advantage plans per year to all 550 Medicare Advantage plans. The primary target of these audits was "risk-adjusted payments." *See* § IV.F.

13. Also in May 2025, *The Wall Street Journal* reported that UnitedHealth Group was under ***criminal*** investigation for its Medicare Advantage coding practices, specifically referencing its use of questionable diagnoses to increase payments for sicker patients.

14. CMS and federal regulators were sending a clear message: the scam was up. Improper medical coding to inflate RAF would no longer be tolerated.

15. Agilon got the message. According to a former Agilon employee, Agilon changed its RAF coding practices once CMS announced its crackdown in May 2025.

16. Without the ability to manipulate RAF and artificially inflate medical revenues, Agilon's medical margin and adjusted EBITDA were wiped out.

17. On August 4, 2025, Agilon announced second quarter financial results and revealed that the Company's RAF revenue for 2024 and 2025 had been inflated by $85 million. The press release stated Agilon would take "***a $37 million reduction in risk adjustment revenue for 2024***" and "***a reduction in risk adjustment revenue of $48 million year-to-date for 2025***[.]" Medical margin and adjusted EBITDA collapsed. *See* § IV.G.

18. Simultaneously on August, 4, 2025, Agilon fired Defendant Sell.

19. On this news, the price of Agilon shares dropped precipitously from a close at $1.815 on August 4, 2025 to close at $0.8801 on August 5, 2025 – a drop of 51%.

## II. JURISDICTION AND VENUE

20. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

21. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

22. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

23. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## III. PARTIES

24. Plaintiffs, as set forth in their previously filed Certifications (ECF Nos. 1-1, 12-2, 18-1), incorporated by reference herein, purchased Agilon common stock during the Class Period and were economically damaged thereby.

25. Defendant Agilon's principal executive offices are located at 440 Polaris Parkway, Suite 550, Westerville, Ohio. Agilon has subsidiaries in New York and conducts business in New York. The Company's common stock trades on the New York Stock Exchange (the "NYSE") under the ticker symbol "AGL".

26. Defendant Agilon describes itself as the "trusted partner empowering physicians to transform health care in our communities."

27. Defendant Steven Sell ("Sell") served as the Company's Chief Executive Officer, President, and as a director on the Board of Directors (the "Board") from June 2020 until August 4, 2025.

28. Defendant Jeffrey Schwaneke ("Schwaneke") served as the Company's Chief Financial Officer at all relevant times.

29. Defendants Sell and Schwaneke are collectively referred to herein as the "Individual Defendants."

30. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

31. Agilon is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

32. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

33. Agilon and the Individual Defendants are collectively referred to herein as "Defendants."

## IV. DEFENDANTS' FRAUDULENT SCHEME

### A. Agilon's Revenue Recognition Practices and RAF

34. Agilon is not paid on a fee-for-service basis. Rather, Agilon's medical services revenue consists of capitation fees under contracts with various Medicare Advantage payors. Under the typical capitation arrangement, the Company is entitled to monthly per-member, per-month ("PMPM") fees to provide a defined range of healthcare services for Medicare Advantage health plan members attributed to the Company's contracted primary care physicians.

35. The Company recognizes revenue in the month in which eligible members are entitled to receive healthcare benefits during the contract term. Agilon receives payments from the payor (the Medical Advantage insurance company), who in turn receives the payments from CMS. These payments do not correspond to any specific medical procedures, but are made in return for Agilon's agreement to cover the contracted for medical services as necessary.

36. The PMPM fees to which the Company is entitled are subject to periodic adjustment under CMS's risk adjustment payment methodology. CMS deploys a risk adjustment model that

determines premiums paid to all payors according to each member's health status and certain demographic factors. Under this risk adjustment methodology, CMS calculates the risk adjusted premium payment using diagnosis data from various settings.

37. Essentially, Medicare Advantage is designed so that Medicare Advantage payors receive higher payments from CMS for sicker patients. Those payments depend on diagnosis or medical coding.

38. The Company and its healthcare providers claim to collect and submit the necessary and available diagnosis data to payors and such data is utilized by the Company to estimate risk adjustment payments to be received in subsequent periods.

39. As Agilon stated in its 2024 Form 10-K, "The Medicare Risk Adjustment Factor ("RAF") scores attributable to members determine, in part, the revenue to which health plans and, in turn, we are entitled for the provision of medical care to such members. The data submitted to CMS by each health plan is based, in part, on medical charts and diagnosis codes submitted to health plans. Each health plan generally relies on us and our physician partners to maintain accurate medical records and appropriately document clinical diagnoses associated with medical services provided to members."

40. Accordingly, CMS pays Medicare Advantage payors/insurers based, in part, on how sick covered patients are. CMS pays Medicare Advantage payors more for patients that are sicker. Medicare Advantage payors pass along these higher payments to Agilon.

41. Agilon and its provider partners code each patient and assign an ***estimated*** RAF score to each patient. The Medicare Advantage payors/insurers then pay Agilon based (in part) on the RAF scoring. The higher the RAF scores for each patient, the more Agilon gets paid.

42. As such, Agilon is incentivized to record as high a RAF score as possible for each

patient under its care to maximize its PMPM revenue. However, if Agilon assigns too high a RAF score to a patient – and CMS discovers that the RAF score is higher than it should be – Agilon and the payors it contracts with face penalties and potential claw back of PMPM fees.

## B. Medical Margin and EBITDA

43. The cost side of Agilon's business consists of, among other things, how much Agilon must pay to its provider partners to deliver health care services to covered patients.

44. During the Class Period, Agilon reported its medical margin. Agilon's 2024 Form 10-K states: "We define medical margin as medical services revenue after medical services expense is deducted. Medical services expense represents costs incurred for medical services provided to our members. As our platform matures over time, we expect medical margin to increase in absolute dollars."

45. Medical margin is a non-GAAP financial measure. Medical margin is similar to gross profit. Agilon's 2024 Form 10-K states: "Gross profit is the most directly comparable financial measure calculated in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP") to medical margin."

46. Gross profit is considered a measure of a company's core business profitability: revenues minus the cost of goods sold. Gross profit (like medical margin) excludes indirect costs such as marketing, administration, and debt interest expenses.

47. During the Class Period, Agilon also reported adjusted EBITDA. Agilon's 2024 Form 10-K states: "We define Adjusted EBITDA as net income (loss) adjusted to exclude: (i) income (loss) from discontinued operations, net of income taxes, (ii) interest expense, (iii) income tax expense (benefit), (iv) depreciation and amortization, (v) stock-based compensation expense, (vi) severance and related costs, and (vii) certain other items that are not considered by us in the

evaluation of ongoing operating performance."

48. Agilon told investors that medical margin and adjusted EBITDA were important business metrics by which to measure the Company's performance. With respect to medical margin, the Company's 2024 Form 10-K stated: "We believe this metric provides insight into the economics of our capitation arrangements as it includes all medical services expense directly associated with our members' care."

49. With respect to medical margin and adjusted EBITDA, the Company's 2024 Form 10-K further stated:

> We believe medical margin and Adjusted EBITDA help identify underlying trends in our business and facilitate evaluation of period-to-period operating performance of our operations by eliminating items that are variable in nature and not considered by us in the evaluation of ongoing operating performance, allowing comparison of our recurring core business operating results over multiple periods. We also believe medical margin and Adjusted EBITDA provide useful information about our operating results, enhance the overall understanding of our past performance and future prospects, and allow for greater transparency with respect to key metrics we use for financial and operational decision-making. We believe medical margin and Adjusted EBITDA or similarly titled non-GAAP measures are widely used by investors, securities analysts, ratings agencies, and other parties in evaluating companies in our industry as a measure of financial performance. Other companies may calculate medical margin and Adjusted EBITDA or similarly titled non-GAAP measures differently from the way we calculate these metrics. As a result, our presentation of medical margin and Adjusted EBITDA may not be comparable to similarly titled measures of other companies, limiting their usefulness as comparative measures.

50. Investors did in fact closely track Agilon's reported medical margin and adjusted EBITDA. During the Class Period analysts reiterated the Company publicly reported medical margin and adjusted EBITDA as indications of the Company's core business value that would be unlocked from scaling by growth in revenues.

51. Though Agilon was not a profitable business in 2022 or 2023, Agilon was able to report positive medical margin of $291 million in 2022 and $298.7 million in 2023.

52. At the beginning of the Class Period on February 25, 2025, Agilon reported

negative earnings for the full fiscal year of 2024, but was able to report positive medical margin of $205 million for fiscal year 2024. In this same press release, Agilon provided investors with annual 2025 medical margin guidance of $275 to $325 million. The Company's core business was making money.

53. On May 6, 2025, Agilon reported medical margin for the first quarter of 2025 of $128 million. Agilon provided investors with guidance on medical margin of $50 to $70 million in the second quarter of 2025, and $275 to $325 million in medical margin for the full year 2025.

54. When Agilon reported second quarter 2025 earnings only a few months later on August 4, 2025, the Company's medical margins had collapsed. For the three months ended June 30, 2025, medical margin was a negative $53 million. Further, the Company withdrew full year medical margin guidance.

55. In February 2026, Agilon reported negative $57 million medical margin for full year 2025.

56. With respect to adjusted EBITDA, Agilon reported progressively worse adjusted EBITDA in 2022 (negative $45.5 million), 2023 (negative $95 million), and 2024 (negative $154 million). On February 25, 2025, Defendants indicated Agilon would turn that around, estimating 2025 adjusted EBITDA at a range of negative $55 million to negative $95 million. On May 6, 2025, Agilon demonstrated it had turned things around and reported an impressive adjusted EBITDA of $128 million.

57. Agilon reported second quarter 2025 earnings only a few months later on August 4, 2025. The Company's adjusted EBITDA had collapsed. For the three months ended June 30, 2025, adjusted EBITDA was a negative $83 million. Further, the Company withdrew full year adjusted EBITDA guidance. In February 2026, Agilon reported adjusted EBITDA of negative

$296 million, far worse than prior years.

58. Medical margin and adjusted EBITIDA collapsed in the second quarter of 2025 and didn't recover for the entire year. What happened? As set forth in the next few sections, prior to the second quarter of 2025, Agilon had been artificially and fraudulently inflating its RAF scoring through improper aggressive medical coding. This improper medical coding not only captured additional RAF revenue for treated patients, but artificially inflated Agilon's reported medical margins and adjusted EBITDA. In May 2025, federal regulators committed to auditing Medicare Advantage payors/insurers, which shut down Defendants' scheme and resulted in the collapse of Agilon's medical margins and adjusted EBITDA reported on August 4, 2025.

### C. <u>Medical Coding, RAF Scores, and CMS Audits</u>

59. ICD-10-CM (International Classification of Diseases, 10th Revision, Clinical Modification) is a standardized system used to classify and code all diagnoses, symptoms, and procedures recorded in conjunction with hospital care.

60. The ICD-10-CM was created by the World Health Organization and adapted for use by the National Center for Health Statistics ("NCHS") in the U.S.

61. ICD-10-CM provides a standardized framework across all healthcare settings. ICD-10-CM has been the accepted standard in the United States since it was implemented in October 2015. The official guidelines for ICD-10-CM provide clear instructions for coders to follow, ensuring consistency and accuracy in the coding process. Each year, CMS and the NCHS provide updated guidelines to clarify how ICD-10-CM should be used.

62. Thorough documentation is critical for accurate coding. Every ICD-10-CM code selected must be supported by clear and sufficient clinical documentation from the healthcare provider. If a diagnosis is ambiguous or the clinical documentation doesn't match the selected

code, the coder should seek clarification from the provider.

63. CMS does not pay based on every diagnosis identified in ICD-10-CM. Instead, CMS maps certain ICD-10 codes into Hierarchical Condition Categories ("HCCs"). Those HCCs contribute to the patient's Risk Adjustment Factor or RAF.

64. For an HCC-generating diagnosis to count, the medical record must support that the condition existed and was addressed during the reporting year. Each HCC in a patient's RAF score must be backed by provider documentation. If it isn't, CMS can collect overpayments.

65. To ensure that Medicare Advantage payors/insurers do not overcharge CMS, CMS conducts periodic audits to ensure RAF scores are accurate. According to CMS: "The Medicare Advantage (MA) Risk Adjustment Data Validation (RADV) program is CMS' primary way to address overpayments to Medicare Advantage Organizations (MAOs). During a MA RADV audit, CMS confirms that any diagnoses submitted by an MAO for risk adjustment are supported in the enrollees' medical records. If diagnoses are unsupported by the medical records, CMS may collect overpayments."

66. Under the RADV program, Medicare conducts audits in which they compare MA-submitted patient diagnosis codes with patients' medical records to identify potential instances of upcoding, or inflating the severity or number of medical conditions for a patient, during the risk adjustment process.

67. As a historical matter, only a small fraction of MA-submitted patient diagnosis codes had been subject to CMS audits under the RADV program. The frequency of such audits would be subject to change in 2025, when CMS declared its new policy would be to audit every MA payor/insurer every year. *See* § IV.F. CMS's heightened auditing procedures would significantly impact Agilon's ability to inflate RAF scores.

### D. Changes to the CMS-HCC Model: V28 Replaces V24

68. In 2023, CMS was operating under CMS-HCC Model 24 (Version 24), commonly referred to as V24. V24 was the Medicare Advantage risk-adjustment model that CMS used for many years to calculate a patient's Risk Adjustment Factor (RAF) based on demographic characteristics and diagnosis codes. How much CMS pays Medicare Advantage plans for that patient would depend on the RAF score.

69. In February 2023, CMS described how medical coding and the HCC system is used to adjust RAF scores as follows:

> The current risk adjustment model employed to adjust MAO [Medicare Advantage Organization] payments is known as the CMS Hierarchical Condition Category (CMS-HCC) model. This model functions by categorizing International Classification of Disease, Clinical Modification (ICD-CM) diagnosis codes into disease groups called Hierarchical Condition Categories, or HCCs. Each HCC includes diagnosis codes that are related clinically and have similar cost implications. There are approximately 9,875 diagnoses mapped to 86 HCCs in the CMS-HCC Risk Adjustment Model for 2022. MA enrollee HCCs are assigned based on data submitted to CMS by MAOs. The HCCs contribute to an enrollee's risk score, which is used to adjust a base payment rate. Essentially, the higher the risk score for an enrollee, the higher the expected health care cost for the enrollee and the greater payment that is received by the MAO.
>
> Footnotes omitted

70. In April 2023, CMS released a new model that substantially reduced the number of ICD-10 codes that would result in RAF scoring. The CMS-HCC Model V28 (Version 28) is the updated RAF methodology used by Medicare to estimate healthcare costs and calculate reimbursements in Medicare Advantage. This new model is commonly referred to as "V28." Though V28 was released in April 2023, it was not phased in until January 2024, with further adoption in January 2025, and full implementation in January 2026.

71. V28 dramatically reduced the number of risk-eligible conditions to increase RAF and also tightened documentation standards. V28 removed or downgraded many previously high-

value conditions, particularly in metabolic, musculoskeletal, and behavioral health categories.

72. V28 had the potential to significantly reduce RAF-related revenue for MA payors/insurers, including those that Agilon contracted with.

73. Against this backdrop of V28's reduced conditions eligible for increasing RAF scores, and heightened documentation requirements, Agilon management increasingly pressured Agilon's medical coders and auditors to more aggressively find diagnoses that would increase patients' RAF scores.

74. As detailed in the next section, when faced with V28 reducing RAF scores and medical revenues per patient, Agilon required medical coders to violate coding regulations to pick up HCC diagnoses and increase Agilon's revenue.

## E. Agilon's Improper Medical Coding

### 1. FE-1: Despite V28, "Pick Up the Same Amount of RAF"

75. Former Employee 1 ("FE-1") worked as an Executive Director for Agilon from 2022 through the end of 2025. FE-1 directed operations across two states and reported to a Regional President, who reported to Chief Markets Officer Ben Shaker ("Shaker").

76. FE-1 dealt directly with Shaker on a regular basis, as detailed herein. Shaker has served as Chief Markets Officer since September 2020. Shaker, as indicated on Agilon's website, "oversees our physician partnerships across 30+ communities throughout the United States, ensuring these partnerships achieve performance expectations." Shaker was listed in Agilon's 2025 Proxy Statement filed with the SEC on April 17, 2025 as Agilon's third-highest ranking officer (behind Sell and Schwaneke) and is one of the six Named Executive Officers "NEOs" whose compensation is detailed in Agilon's proxy statements. Shaker reported to Defendant Sell.

77. According to FE-1, Shaker and FE-1's immediate boss repeatedly emphasized the

need to "code better" and "capture more diagnoses." For example, FE-1 described being instructed by both Shaker and FE-1's immediate boss to include heart failure diagnoses even when patients only had mild echocardiogram changes that did not meet clinical criteria.

78. FE-1 explained that Agilon continuously monitored the prevalence of major chronic conditions – particularly heart failure, COPD, and dementia – because these conditions drove both RAF (Risk Adjustment Factor) and financial planning. Agilon tracked how many patients had been screened, how many had documented diagnoses, and how those rates compared to internal expectations. According to FE-1, Agilon maintained centralized scorecards that displayed each market's RAF, prevalence, and projected financial impact, along with how much prevalence "could be increased."

79. According to FE-1, in 2024 and 2025 Agilon Chief Markets Officer Ben Shaker pressed FE-1 to increase "prevalence" of chronic conditions in FE-1's markets – or the percentage of her population that had a documented chronic condition, as captured through ICD-10 codes that map to HCCs. For example, FE-1 recalled being told that only five percent of FE-1's population had documented congestive heart failure and that FE-1 needed to "find" another fifteen percent to bring the rate up to expectations. FE-1 said this directive made FE-1 uncomfortable, describing it as crossing an ethical line and pushing FE-1 toward capturing diagnoses that were not clinically supported.

80. FE-1 also described a meeting with her immediate supervisor in which prevalence rates were discussed. FE-1 recalled that FE-1's boss did not frame the initiative as an effort to uncover clinically missed heart related conditions. Instead, FE-1 understood the purpose to be purely to increase RAF scores. FE-1 confirmed that this messaging was clear internally.

81. FE-1 and others were under intense pressure, which came from Shaker and the

finance department. Agilon (through Shaker and the finance department) pushed for aggressive screening of anyone with conditions that could predispose them to heart failure – such as kidney disease or diabetes. While this screening could be clinically appropriate, Agilon crossed the line when the expectation shifted from identifying true disease to meeting prevalence targets pushed by the finance department.

82. According to FE-1, Agilon addressed prevalence of chronic conditions rates not to uncover clinically missed diagnoses, but purely to increase RAF scores. To further this goal, Agilon used scorecards showing current RAF levels, potential RAF levels, and adoptions rates. The scorecards were used to apply pressure to Agilon's various geographic sections by comparing them to one another. According to FE-1, "everyone was expected to keep raising the numbers" and groups were pitted against one another.

83. Scorecards also captured topics such as heart failure, dementia, COPD, and general RAF capture. The pressure from Agilon management (including Shaker) to increase numbers to meet internal benchmarks often went beyond what was reasonable. Groups felt "incredible pressure" to raise RAF scores regardless of whether additional diagnoses were clinically appropriate. The scorecards created a competition where teams were "scrambling not to be the one at the bottom."

84. According to FE-1, Agilon's CEO and CFO had access to these scorecards. FE-1's team produced deep dive market reports derived from the scorecards, which were delivered to Agilon's CEO and CFO (Defendants Sell and Schwanake) electronically.

85. FE-1 also described a centralized process in which Agilon's risk-adjustment staff reviewed patient lists, identified who had been screened, and flagged patients whose diagnoses were "missed" by the provider (i.e., the doctor). When doctors/providers disagreed with a

recommended diagnosis provided by the Agilon risk-adjustment staff, FE-1 said that Agilon repeatedly sent the recommended diagnosis back to the provider/doctor multiple times with suggestions to reconsider it.

86. FE-1 believed the Company's approach to coding and risk adjustment was misleading and created exposure, particularly given the risk of audit and the potential need to restate RAF numbers.

87. According to FE-1, V28 (CMS's new HCC coding guidelines described in § IV.D.) made it substantially harder to generate prior-year RAF levels because V28 eliminated codes and reduced the weight of many conditions. As a result, the same clinical work could generate lower RAF scores and less reimbursement, even where patient acuity remained unchanged. The transition was stressful because it increased revenue and forecasting pressure on operators. Agilon leadership responded by emphasizing the need to "***pick up the same amount of RAF***" and make up the difference through other mechanisms. With the implementation of V28, coders and auditors felt immediate and persistent pressure to maintain RAF.

88. During the V28 transition, Agilon leadership focused heavily on coding, RAF, adoption rates, and diagnosis opportunities. According to FE-1, the reports FE-1 prepared on these topics were provided to Ben Shaker and were included in the PowerPoints presented at the senior leadership level.

89. According to FE-1, Agilon Directors (like FE-1) were responsible for creating reports and PowerPoints for presentations for financial and performance reporting used by senior leadership and were provided to Ben Shaker. FE-1 confirmed that the reports FE-1 created included RAF, diagnosis adoption rates, and related metrics, and that the reports rolled up through Shaker, who FE-1 believes provided those reports to Agilon's CEO and CFO.

90. According to FE-1, Agilon rewarded with promotions those employees that encouraged improperly aggressive coding practices that made patients appear sicker than they were in order to capture higher RAF scores on Medicare Advantage members. Conversely, Agilon punished employees, including FE-1, who refused to go along with the scheme to inflate RAF through improper coding and to increase prevalence of chronic conditions. Senior leadership (Shaker in particular) was behind the retaliation against FE-1.

**2. FE-2: The Worst Coding FE-2 Had Ever Seen**

91. FE-2 worked at Agilon as a Risk Adjustment Coder, Risk Adjustment Auditor, and Senior Risk Adjustment Auditor. FE-2 started at Agilon before 2020 and stayed with the Company through February 2025. FE-2 reported to Nicole Bell (Director of Coding), then to Kathy Daniels (Coding Quality Manager), and finally to Bell and Kristina Hewitt (Risk Adjustment Coordinator Assistant Manager).

92. According to FE-2, Risk Adjustment was vital to Agilon's revenue model. RAF scores directly determined the reimbursement rate for each patient, and thus Agilon's revenue was dependent on those scores.

93. FE-2's job centered on reviewing medical records, validating diagnosis coding, and ensuring compliance with risk-adjustment standards. FE-2 would log into the Company's systems each day and review medical charts for accuracy and then entered diagnosis information into the coding platform, which then translated those codes into data used by payors to determine reimbursement rates.

94. According to FE-2, there was a strong organizational focus on achieving higher RAF scores. FE-2 repeatedly observed coding issues such as inflated RAF scores, unsupported diagnoses, documentation gaps, and revenue driven coding practices throughout her time at Agilon

after Agilon hired a new Director of Healthcare Operations and Risk Management in April 2023, Amy Czahor ("Czahor").

95. After Czahor joined Agilon, coding practices changed drastically. According to FE-2, Czahor held frequent meetings with medical coders and auditors to give direction on coding practices. Czahor focused the meetings on coding practices that would increase RAF scores. Czahor encouraged coders to treat minimal or incidental mentions in the chart as justification to report diagnoses, even when those conditions appeared only on the problem list without meaningful clinical relevance. FE-2 did not believe Czahor's approach was aligned with accurate reporting requirements. Among other things, FE-2 believed that coders were not supposed to infer or connect conditions without proper documentation, and codes could not be added based on assumptions or patterns – contrary to what Czahor was encouraging coders to do.

96. FE-2's boss Director of Coding Nicole Bell would instruct FE-2's team of coders that if a patient was seen for a particular condition, they should "capture this diagnosis" even when the provider had not documented the diagnosis clearly. Bell framed this as identifying documentation gaps, but in practice it often meant adding codes that were not fully supported. The messaging from management encouraged adding more codes in a way that FE-2 thought was inconsistent with proper coding standards.

97. Agilon leadership regularly stressed the Company's key goal of improving providers' (i.e., doctors') RAF outcomes and regularly prioritized higher RAF scores. Leadership's messaging created pressure to inflate RAF scores, according to FE-2. To improve or increase RAF scores meant to capture more diagnosis codes thereby demonstrating the patient was sicker than previously indicated, and therefore increasing the amount of money CMS paid for the patient to be treated.

98. The Company regularly audited medical coders' work, and these audit findings were recorded and monitored by the Company according to FE-2. However, medical coders who repeatedly failed audits faced no consequences.

99. FE-2 became an auditor and personally observed significant inaccuracies in coding practices. FE-2's duties as a Risk Adjustment Auditor included regular meetings with management to discuss audit findings, clarify documentation standards, and provide staff retraining. According to FE-2, Agilon's coding practices did not reliably reflect clinical reality, and Agilon's organizational focus on increasing RAF scores often overshadowed the importance of accuracy and compliance.

100. FE-2 believed that Agilon hired many inexperienced medical coders and leadership's pressure to increase RAF scores influenced those medical coders to increase revenue even when documentation did not support it. FE-2 found the pattern of such behavior concerning.

101. FE-2 described the coding at Agilon as the worst FE-2 had ever witnessed, and that a majority of the coding was not meeting standards. As an auditor, FE-2 was assigned teams of coders to audit and most of the coders failed their audits. FE-2 drew on FE-2's background in medical coding, including FE-2's work at Signify Health and FE-2's on site experience across multiple VA medical practices – urology, orthopedics, and a women's center/OB GYN – to explain the contrast. In those environments, coding expectations were clearer, documentation standards were higher, and the workflow supported accurate clinical representation. At Agilon, FE-2 saw persistent issues that went beyond isolated mistakes.

102. FE-2 believed that the level of coding inaccuracies raised serious concerns about how the Company could function with an error rate that high. According to FE-2, these coding inaccuracies were documented in spreadsheets used for internal audits and were shared with the

internal control team. FE-2 believed these issues should have been visible to leadership, including the CEO and CFO.

103. According to FE-2, the coding errors were almost entirely biased toward higher compensation. Coders were encouraged to capture additional diagnoses, lean on historical or problem list conditions, and avoid marking questionable codes as errors even when the documentation did not support them. According to FE-2, there was a consistent upward bias rather than a mix of over and under-coding. Under-coding was not a meaningful issue at Agilon.

104. According to FE-2, Agilon placed particular emphasis on diabetes because of its prevalence in healthcare and the number of related conditions that could be linked to it. Training sessions frequently revisited how to interpret documentation and how to connect secondary conditions to diabetes in ways that would increase the RAF score.

105. In 2024, Agilon outsourced many coder positions to India, according to FE-2. The coding quality of the Indian coders was worse than Agilon's US coders, as many of the Indian coders did not follow protocol and were approving charts inaccurately. According to FE-2, the coding errors FE-2 saw from the Indian coders likewise almost always increased RAF rather than decreasing it, reflecting a consistent push to capture more conditions. The offshore coding teams in India raised more concerns than any other group that FE-2 reviewed.

106. FE-2 believes that given the scale of the inaccuracies FE-2 observed in Agilon's coding, the financial impact could reach the hundreds of millions of dollars.

### 3. FE-3: Drive RAF Scores as High as Possible

107. FE-3 worked as a Medical Coder before advancing to Senior Medical Auditor and Quality Auditor for Agilon Health from June 2019 through January 2025. FE-3 reported initially to McKenzie Hillard and later reported to Kathy Daniel, Audit Manager.

108. Since June 2022, FE-3 served as a Coding Quality Auditor, with responsibilities focused on reviewing medical records, verifying diagnosis coding accuracy, and ensuring adherence to risk adjustment standards. FE-3's role included conducting audits of coders. FE-3 supported HCC coding at multiple sites, conducting audits and ensuring coder accuracy and compliance.

109. HCC stands for Hierarchical Condition Category and is the core risk-adjustment coding system used by CMS to group patient diagnoses into clinically related categories that determine how much MA plans are paid for each member.

110. Like FE-2, FE-3 described how the coding environment at Agilon shifted after the arrival of Czahor in April 2023. Prior to Czahor's tenure, Kathy Daniel enforced strict adherence to documentation requirements, ensuring that every HCC had clear clinical support. After Czahor took over, the guidelines became much more lenient. FE-3 said coders were now permitted/encouraged to pick up diagnoses simply because they appeared on the problem list or were mentioned in passing, even when the documentation did not substantiate the condition. FE-3 viewed this as a move toward upcoding and said it became more pronounced toward the end of 2024. FE-3 expressed a strong disagreement with this process and communicated these concerns to leadership, including Czahor.

111. FE-3 emphasized that after Czahor arrived, the focus was not on correcting unsupported HCCs or tightening documentation standards. Instead, the emphasis moved toward capturing diagnoses even when the notes did not support them. This represented a clear departure from what the department should have been prioritizing – assuring that reported HCCs were clinically substantiated.

112. FE-3 also reported that Czahor frequently overturned FE-3's audit results. FE-3

said Czahor consistently sided with coders, even when documentation did not support the diagnosis. FE-3 was also asked to change audit conclusions when FE-3 identified unsupported diagnoses. When FE-3 marked a code as an error due to lack of documentation, Czahor instructed FE-3 not to classify it as an error. When FE-3 objected, FE-3 was told that under the Company's interpretation of International Classification of Diseases Official Guidelines for Coding and Reporting (aka ICD 10 guidelines), the code was "allowable," even when the record lacked clinical support.

113. According to FE-3, discussions about coding accuracy and RAF scores occurred frequently in leadership settings, and ***the consistent theme was to drive RAF scores as high as possible***. FE-3 recalled meetings where Czahor and other leadership emphasized changing or loosening guidelines specifically to elevate RAF outcomes.

114. FE-3 described seeing RAF scores rise sharply in ways that did not make clinical sense, including jumps from approximately 0.65 to 1.75, even though the underlying patient conditions should have remained stable or decreased. FE-3 noted that the system Agilon used displayed each patient's RAF score based on reported codes and that anyone with access could view those values.

115. FE-3 described sustained pressure from management to increase RAF scores. When FE-3 identified unsupported diagnoses in audits, leadership pushed back and told FE-3 certain codes could still be taken despite inadequate documentation – a change implemented by Czahor and motivated by financial incentives to maximize risk scores.

116. According to FE-3, inflated RAF scores, unsupported diagnoses, documentation gaps, and revenue driven coding practices were persistent concerns at Agilon. When Czahor arrived, she made it clear that she knew how to raise RAF numbers and had done so at a previous

company. According to FE-3, Czahor immediately loosened coding standards and encouraged coders to pull diagnoses from the unsupported problem list even when those conditions were not addressed or supported in the encounter. FE-3 said this approach allowed coders to report any condition that had ever been listed at any point in time, regardless of clinical relevance.

117. FE-3 also indicated that Czahor offshored a significant portion of the coding work to a team in India, which FE-3 believed was done because it was cheaper and because offshore coders were less likely to push back on questionable coding practices. FE-3 described the coding environment after this shift as "lax," with little resistance to capturing diagnoses that would increase RAF scores.

118. FE-3 did not believe the Company's FY25 guidance was realistic, particularly in light of the CMS risk adjustment changes that took effect with implementation of V28. According to FE-3, CMS eliminated a substantial number of HCC codes with the V28 standard and there was "no way" the Company could project higher revenue when the number of billable HCCs had been significantly cut. The Company's guidance was fundamentally inconsistent with the regulatory environment.

119. All audit findings were documented and tracked in spreadsheets maintained by FE-3's audit supervisor, Kathy Daniel (Coding Quality Manager). Each audit record contained columns showing what the coder originally reported, the auditor's determination of whether it was correct, and a section where the coder could indicate agreement or disagreement and add comments.

**4. FE-4: Coding Conflicted with National Guidelines**

120. FE-4 worked as an HCC Coding Analyst for Agilon Health from May 2022 to February 2025. FE-4 reported to Kelsye Twilligear who was FE-4's direct supervisor as well as to

Coding Manager Dee Kelly. Kelly reported up to Czahor who was the Director of Healthcare Operations and Risk Adjustment

121. According to FE-4, ***Agilon's internal coding standards often conflicted with national coding guidelines. FE-4 viewed this as a systemic issue*** rather than the fault of any single coder.

122. Like FE-2 and FE-3, FE-4 described Agilon as coaching coders in ways that indirectly encouraged higher RAF scores. Czahor was central to these efforts.

123. According to FE-4, Czahor would hold meetings where she presented examples of what to accept or reject and encouraged coders to pull diagnoses from past medical history or prior encounters. Czahor framed the guidance in vague terms such as "use your best judgment," which left coders responsible for decisions that leadership did not want to take accountability for. FE-4 felt Agilon's expectations were intentionally gray. FE-4 repeatedly asked for clear, black and white rules. FE-4 believed Agilon purposefully created an environment where coders were pressured to accept diagnoses that were not fully supported, while leadership maintained plausible deniability.

124. According to FE-4, Agilon also pressured coders to add HCC codes that were not fully supported by documentation. Supervisors instructed coders to "capture" certain diagnoses whenever a patient was seen, regardless of documentation quality.

125. FE-4 cited as an example that Agilon leadership repeatedly focused on capturing obesity related diagnoses. FE-4 recalled instances where a patient with a BMI of 20 – clearly not obese – was nevertheless labeled as having Class 3 morbid obesity. FE-4 found Agilon's instructions regarding morbid obesity conflicting and clinically implausible. Providers often had obesity listed in their problem lists, and Agilon leadership emphasized using those entries even when the encounter documentation did not support the condition.

126. According to FE-4, Agilon experienced a major disruption when CMS implemented V28 and eliminated numerous HCC codes in January 2024. FE-4 recalled that many codes were eliminated at once, and it felt like many conditions were no longer risk adjusted. FE-4 believes this change created major operational issues for Agilon because diagnoses that had historically contributed to revenue no longer did. FE-4 anticipated that the financial impact would be severe and believed the Company was already struggling financially.

**5. FE-5: "Dinged" on Audits for Refusing to Up-Code**

127. FE-5 worked as a Risk Adjustment Coder and Senior Coder for Agilon Health from August 2022 to February 2025. FE-5 reported to Kelsye Twilligear. FE-5's work centered on validating risk-adjustment accuracy, ensuring documentation integrity, and maintaining alignment between provider documentation, internal data systems, and CMS risk-adjustment requirements.

128. According to FE-5, the guidance from Agilon management, including Czahor, conflicted with CMS requirements. FE-5 was concerned that pressure to up-code unsupported diagnoses could jeopardize FE-5's certification and license.

129. Throughout FE-5's tenure, FE-5 observed a persistent pattern of inflated RAF scoring, driven largely by the way coders were being "dinged" on audits whenever they refused to up-code diagnoses that were not supported by documentation. FE-5 repeatedly explained that FE-5 could not up-code because coding clinics and CMS guidance did not allow it, yet leadership continued to push for higher RAF capture.

130. When FE-5 and others downcoded to remain compliant with their obligations under CMS guidance, their audit scores suffered. Instead of addressing the underlying documentation issues, Agilon leadership responded by saying they did not agree with the coder's findings. Agilon created an environment where compliance was secondary to revenue expectations. Czahor drove

the message from leadership to code to capture RAF.

131. According to FE-5, unsupported diagnoses were a recurring issue. Coders were frequently encouraged to pull diagnoses from the patient's problem list even when the entries were outdated or lacked documentation. For example, FE-5 recalled working on a recent chart where the last update to the problem list was from 2020, yet there was pressure to use it anyway.

132. Agilon also warned coders to pick up diagnoses such as morbid obesity from the problem list even when it was not compliant. FE-5 refused to do so and was "dinged" by Agilon's auditors again. FE-2 simply accepted the audit hit rather than risk further retaliation. In FE-5's view, the Company was hemorrhaging money, leadership was under pressure, and the coding team was caught in the middle of conflicting expectations, unclear guidance, and a push for higher RAF scores that often conflicted with CMS rules.

133. FE-5 said coders were repeatedly pressured to code obesity-related HCCs without a current BMI to support the diagnosis, despite the risk to their certification. FE-5 and others repeatedly reminded leadership that they could not code morbid obesity unless the BMI was over 40, or there were qualifying comorbidities. Agilon leadership ignored the coders and the BMI requirement.

134. When providers indicated obesity without proper backup (for example, the patient's BMI was under 35, the patient was not on medication, and the documentation clearly did not support morbid obesity), coders were discouraged from issuing a provider query to address the matter.

135. According to FE-5, coders at Agilon (including FE-5) were so concerned about their licenses being revoked that they created files of email exchanges with their superiors documenting the pressure they were under to improperly code in violation of CMS guidelines. FE-

5 was unable to access these emails after FE-5 was terminated by the Company, as FE-5's access to FE-5's computer was immediately cut off.

**6. FE-6: Operational Model Relied on Aggressive Coding**

136. FE-6 worked as an Assistant Manager for Agilon Health from March 2019 to February 2025. FE-6 began as a coder. FE-6 reported to Jordan Leuvoy, Regional Coding Manager. FE-6 progressed from coder to program manager overseeing the pre-visit chart review program for the South region, then transitioned into the Assistant Manager role approximately one year before leaving Agilon. FE-6 provided daily management and oversight of approximately 20 medical coders across multiple geographic areas, including the South, South Central, and Midwest regions. FE-6 was responsible for identifying opportunities for auditing, providing coder feedback and education, and analyzing medical records to abstract validated Hierarchical Condition Categories (HCCs) and HEDIS (Healthcare Effectiveness Data and Information Set) measures.

137. According to FE-6, Agilon's operational model relied on aggressive coding rather than clinical improvement. The organizational posture prioritized increasing RAF, and coding expectations were shaped around revenue impact rather than documentation integrity or provider education needs. FE-6 stated that leadership pushed for higher RAF scores regardless of documentation quality, and this expectation was communicated repeatedly.

138. FE-6 believes that Agilon began pushing to increase RAF in early 2023, with pressure first on the PMR (Pre-Visit Medical Record) team and then escalating to the coding team.

139. In the view of FE-6, coding errors from 2023 and 2024 directly contributed to the revisions in Prior Year Development (PYD) and RAF performance in 2025. FE-6 explains that risk adjustment operates on a lag: the diagnoses captured and validated in one year determine CMS payment for the following year.

140. FE-6 described how Agilon used a pre-visit chart-review program to increase RAF scores. The pre-visit chart review program had an Agilon employee review a patient's medical records ***before*** an upcoming appointment to identify care gaps and/or conditions to recommend diagnosis codes (or HCCs) to the provider. According to FE-6, Agilon's Maria Hill and Ronny Castillo directed staff to "raise our HCC by 1.2" through the pre-visit chart review program. Agilon told chart reviewers to look for clinically relevant information before visits and recommend codes to providers. According to FE-6, providers often accepted and billed Agilon recommended codes even when their notes did not support a valid diagnosis.

141. Further, according to FE-6, when Agilon believed its pre-visit reviewers were not increasing RAF scores sufficiently, leading to management frustration, Agilon brought in overseas pre-visit reviewers that would more aggressively suggest HCC codes and generate additional diagnoses.

142. FE-6 described Agilon as highly revenue focused, with consistent messaging not to "upset providers" unless an issue affected RAF scores. If a coding clarification was expected to increase RAF, it was encouraged; if not, it was deprioritized.

143. Agilon also explicitly told coders to prioritize certain diagnoses, including morbid obesity and cancer, because of their impact on RAF scoring.

144. Similarly, FE-6 explained that when leadership perceived an auditor as "picking on" a coder or identifying issues that conflicted with revenue goals, the findings were dismissed or not acted upon. FE-6 emphasized that this pattern occurred even when the quality concerns were legitimate and clearly documented.

145. Like the other witnesses, FE-6 described Agilon as increasingly pressuring coders to increase RAF by capturing more HCCs. FE-6 explained that Agilon leadership, particularly

Czahor, questioned why coders were not picking up more HCCs and had a growing expectation to increase condition capture.

146. Finally, FE-6 participated in Agilon town hall meetings, including at the end of 2024, where Defendants Sell and Schwaneke raised concerns that RAF performance was deteriorating. Leadership stated that "our RAF is going down." According to FE-6, these messages came from executives during quarterly financial updates and were framed as part of broader concerns about organizational performance.

**7. FE-7: All they Cared About was Capturing More HCCs**

147. FE-7 worked as a Senior Coder for Agilon Health from August 2022 to January 2025. FE-7 reported to Nicole Bell, the current Director of Coding. FE-7's work centered on validating risk-adjustment accuracy, ensuring documentation integrity, and maintaining alignment among provider documentation, internal data systems, and risk-adjustment requirements. FE-7 also audited HCC coding.

148. According to FE-7, Agilon was aware of widespread coding errors but chose not to address them. The message from Agilon leadership: issues would be "dealt with later," and coders were expected to follow Agilon's instructions rather than apply the outside training they had received. FE-7 repeatedly raised concerns to FE-7's boss Nicole Bell and to Czahor (Agilon's Director of Healthcare Operations and Risk Adjustment), who responded to "do what I say," rather than any meaningful engagement with compliance standards.

149. Questionable coding practices were tolerated or encouraged, and many leaders did not understand compliance from a U.S. regulatory perspective, according to FE-7.

150. Further, Agilon incentivized providers (doctors) to agree with the Company's coding posture because higher HCC capture increased revenue. According to FE-7, Agilon

leadership communicated to providers that Agilon would "tell them how to make their money," and that providers would be incentivized for reporting more HCCs. Agilon generated lists of HCCs identified through chart scouring and sent these lists to providers, instructing providers to validate or pick up those conditions.

151. FE-7 further stated that coders were required to follow processes that resulted in unsupported or upcoded conditions. Coders were prohibited from speaking directly with providers, even when providers' documentation was unclear or noncompliant. All communication had to occur through formal queries, and if a provider repeatedly documented something incorrectly, Agilon instructed coders to "leave [providers] alone" rather than escalate or correct the problematic diagnosis data from the provider. FE-7 viewed this as part of a broader pattern in which leadership did not want to know about noncompliant documentation and preferred to avoid confronting providers about accuracy.

152. FE-7 maintained a spreadsheet documenting concerns about coding practices, documentation issues, and other improper practices. FE-7 sent this spreadsheet to FE-7's manager, who then escalated it up the chain through Nicole Bell and Czahor. Nicole Bell later discussed several of the issues on the spreadsheet with FE-7. FE-7 documented several categories of improper coding on the spreadsheet, as set forth below.

153. **Cloning and Medical Necessity**: According to FE-7, Agilon routinely accepted when doctors gave "cloned documentation" to justify diagnoses. Cloned documentation included instances of identical notes being repeated across multiple patient visits. The concern is that portions of a medical record have been copied and pasted or automatically replicated from a prior note without being updated to accurately reflect the patient's current condition and the services actually provided. Risk adjustment codes would likewise be repeated or pulled forward from prior

patient visits despite the lack of any updated or individualized clinical information. FE-7 believed this led to a lack of medical necessity and upcoding. Agilon normalized this process and Agilon expected coders to accept cloned statements as support.

154. **<u>D68.69 (Other Thrombophilia)</u>**: Thrombophilia is a predisposition to blood clotting. FE-7 indicated that Agilon coders were told to accept this code "as long as it was mentioned near the word AFIB," even when there was no clinical support. Proximity to the word "AFIB" was treated as acceptable justification, even if there was not otherwise proper support.

155. **<u>D84.821 (Immunodeficiency due to drugs)</u>**: Agilon (via Czahor and Bell) instructed coders to apply this code for immunodeficiency caused by medication for patients using any drug on the list that was indicated as having the potential to suppress the patient's immune system. Agilon did so even if the medication was something minor such as a steroid eye drop. FE-7 believed these changes were intended to expand the number of HCCs that could be captured. According to FE-7, this code ***should*** only be applied if the physician explicitly documented the immunodeficiency, linked that immunodeficiency to the causative drug, and documented this in the medical record – but Agilon (via Czahor and Bell) instructed coders to ignore these requirements.

156. **<u>Historical Conditions and Aggressive Coding</u>**: According to FE-7, Czahor instructed coders to "pull a diagnosis forward" and continue reporting historical conditions. FE-7 recalled being told to "be aggressive on the other side," which FE-7 interpreted as pressure to capture more conditions.

157. Agilon ignored FE-7's concerns about coding. Management showed little interest in any issue unrelated to increasing HCC capture. When FE-7 raised concerns about provider cloning, documentation quality, or clinical validity, those concerns were dismissed. FE-7

remembered leadership expressing that "all they cared about" was capturing more HCCs.

158. FE-7 spoke with employees still at the Company after FE-7 left in January 2025. According to FE-7, Agilon changed its coding policies in 2025 after CMS announced its crackdown on RAF upcoding and other medical coding fraud associated with the MA program.

### F. Heightened Public and Government Scrutiny of MA Coding

159. On May 15, 2025, *The Wall Street Journal* reported that UnitedHealth Group was under criminal investigation and had been questioned by the government into its "coding practices" within its Medicare Advantage insurance business. The article further reported that the Justice Department's criminal division was engaging in a broader probe of payors in the Medicare Advantage program related to manipulation of RAF scores.

> The Justice Department is investigating UnitedHealth Group for possible ***criminal Medicare fraud***, people familiar with the matter said.
>
> The healthcare-fraud unit of the Justice Department's criminal division is overseeing the investigation, the people said, and it has been an active probe since at least last summer.
>
> While the exact nature of the potential criminal allegations against UnitedHealth is unclear, the people said the federal investigation is focusing on the company's Medicare Advantage business practices.
>
> * * *
>
> For years, the unit focused on busting doctors, laboratories and other service providers who overbill government health programs and insurers.
>
> But ***the unit has turned its focus to insurers in the Medicare Advantage system***, where they now oversee taxpayer funded benefits for more than half the seniors and disabled people in the broader Medicare program, people familiar with the matter said.
>
> Medicare Advantage insurers are paid extra for covering sicker patients, creating an incentive to document diagnoses for patients they cover. In some cases, the Journal's reporting has shown, questionable diagnoses by UnitedHealth added billions to taxpayers' costs.

160. On May 21, 2025, the Centers for Medicare & Medicaid Services issued a press

release titled "CMS Rolls Out Aggressive Strategy to Enhance and Accelerate Medicare Advantage Audits." The press release explained that MA payors could no longer game the system by aggressively coding RAF scores, as CMS would commence taking its audit responsibilities much more seriously. The press release stated:

> Today, the Centers for Medicare & Medicaid Services (CMS) announced a ***significant expansion of its auditing efforts*** for Medicare Advantage (MA) plans. Beginning immediately, CMS will audit ***all eligible MA contracts for each payment year*** in all newly initiated audits and invest additional resources to expedite the completion of audits for payment years 2018 through 2024.
>
> "We are committed to crushing fraud, waste and abuse across all federal healthcare programs," said Dr. Mehmet Oz, CMS Administrator. "While the Administration values the work that Medicare Advantage plans do, it is time CMS faithfully executes its duty to audit these plans and ***ensure they are billing the government accurately*** for the coverage they provide to Medicare patients."

161. Furthermore, the CMS press release explained that CMS was specifically concerned with RAF scoring as a source of sizable fraud in the Medicare Advantage program, particularly because CMS had previously been derelict in its enforcement of the rules and audits of payors. The press release stated:

> Medicare Advantage plans receive risk-adjusted payments based on the diagnoses they submit for enrollees – meaning higher payments for patients with more serious or chronic conditions. To verify the accuracy of these claims, CMS conducts Risk Adjustment Data Validation (RADV) audits to confirm that diagnoses used for payment are supported by medical records.
>
> Currently, ***CMS is several years behind in completing these audits***. The last significant recovery of MA overpayments occurred following the audit of payment year (PY) 2007, despite ***federal estimates suggesting MA plans may overbill the government by approximately $17 billion annually***. The Medicare Payment Advisory Commission (MedPAC) estimates this figure could be ***as high as $43 billion per year***. CMS's completed audits for PYs 2011–2013 found between 5% and 8% in overpayments.

162. The CMS press release further explained that the current presidential administration was taking this issue seriously. CMS would increase its workforce from 40 medical coders to 2,000 medical coders in five months.

163. Further, the May 21, 2025 press release indicated that CMS would significantly increase the level of scrutiny of each audit and that CMS would no longer select only a small fraction of the Medicare Advantage plans for audit. CMS would now audit every Medicare Advantage plan.

> By leveraging technology, ***CMS will be able to increase its audits from ~60 MA plans a year to all eligible MA plans each year*** in all newly initiated audits (approximately 550 MA plans). CMS will also be able to increase from auditing 35 records per health plan per year to between 35 and 200 records per health plan per year in all newly initiated audits based on the size of the health plan. This will help ensure CMS's audit findings are more reliable and can be appropriately extrapolated as allowed under the RADV final rule.

164. In its May 21, 2025 press release, CMS was effectively warning MA providers it would no longer tolerate improper and/or fraudulent coding practices that charged the government for unsupported diagnoses. "CMS will collaborate with the Department of Health and Human Services Office of Inspector General (HHS-OIG) to recover uncollected overpayments identified in past audits. CMS reaffirms its commitment to ensuring all Medicare Advantage plans comply with federal requirements and accurately report patient diagnoses used for payment."

165. On July 9, 2025, *The Wall Street Journal* published an article titled: "Prosecutors Question Doctors About UnitedHealth's Medicare Billing Practices." According to the article, "former [UnitedHealth] employees said the investigators asked detailed questions about UnitedHealth's efforts to encourage the documentation of certain lucrative diagnoses[.]" According to one former doctor, Justice Department investigators asked about medical coding: "It was really about coding."

166. As UnitedHealth Group is the largest insurer in the Medicare Advantage program with 9.9 million enrollees in 2025 representing over 29% of the total number of enrolles, the message was clear that the government would no longer tolerate improper/fraudulent medical coding to capture RAF.

### G. Restated RAF Wipes Out Medical Margin and Adjusted EBITDA

167. Agilon had reported earnings on May 6, 2025, before CMS announced on May 21, 2025 it would crack down on improper medical coding by Medicare Advantage payors/insurers. The next time that Agilon reported earnings after the CMS May 21, 2025 press release was August 4, 2025.

168. On August 4, 2025, Agilon reported second quarter 2025 financial results impacted by a negative revision to RAF of $85 million, consisting of a $37 million negative impact to 2024 and $48 million negative impact in 2025.

169. Agilon reported a ***negative*** medical margin of $53 million for the second quarter. This was contrary to the Company's prior guidance of ***positive*** $50 to $70 million for the second quarter.

170. Agilon provided investors with a detailed explanation for the reduction in medical margin, which was mostly attributable to the reduced RAF scores.

171. Agilon's medical margins would continue to be impacted for the rest of 2025. On February 25, 2026, Agilon reported ***negative*** $57 million medical margin for the full year of 2025. This was dramatically lower than prior years medical margin and much lower than the Company's prior guidance of positive $275-$325 million medical margin for 2025.

172. On August 4, 2025, Agilon also reported adjusted EBITDA of a ***negative*** $83 million. This was contrary to the Company's prior guidance of a negative $20 to negative $35 million. Agilon lost $48 million more than its prior worst case scenario.

173. Without being able to improperly code for higher RAF, and record artificially inflated revenue from RAF, Agilon's business model did not work.

## V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS

174. On February 25, 2025, after market close, Agilon issued a press release entitled "agilon health Reports Fourth Quarter and Full Year Fiscal 2024 Results." The press release quoted Defendant Sell stating: "As a result of the strategic actions we have taken to reduce our underwriting risks, improve our platform capabilities, and maintain cost discipline we have established a stronger foundation for success. Combined with continued market demand we remain focused on supporting our physician partners to deliver high-quality, cost-effective care to their senior patients while driving long-term sustainable financial performance."

175. The February 25, 2025 press release also provided financial metrics, all of which were falsely manipulated by the Company's inflated RAF scores for 2024. The press release stated:

- Total revenue of $1.52 billion in the fourth quarter 2024 increased 44% compared to $1.06 billion in the fourth quarter 2023. For the fiscal year 2024, total revenue of $6.06 billion increased 40% compared to $4.32 billion in 2023. Year-over-year total revenue growth was primarily driven by membership growth in new markets and same geography growth.

- Gross profit of negative $38 million in the fourth quarter 2024 compared to negative $95 million in the fourth quarter 2023. For the fiscal year 2024, gross profit was $5 million compared to $70 million in 2023. Net loss was $106 million in the fourth quarter of 2024 compared to a net loss of $230 million in the fourth quarter of 2023. For the fiscal year 2024, net loss of $260 million compared to a net loss of $263 million in 2023. Net loss for the prior year quarter and fiscal year included a loss from discontinued operations of $63 million and $68 million, respectively.

- Medical margin of $1 million during the fourth quarter 2024, compared to negative $102 million in the fourth quarter 2023. For the fiscal year 2024, Medical Margin of $205 million, compared to $299 million in 2023. The fourth quarter and full year of 2024 included an additional $5 million reserve for estimated 2025 losses on partnerships we intend to exit this year as well as additional medical costs primarily associated with other risk pool and Part D. Medical Margin for the full year 2024 was negatively impacted by continued elevated medical costs in 2024 in addition to prior period development.

- Adjusted EBITDA loss of $84 million in the fourth quarter 2024, compared to an Adjusted EBITDA loss of $137 million in the fourth quarter 2023. For the fiscal year 2024, Adjusted EBITDA loss of $154 million, compared to Adjusted EBITDA

loss of $95 million in the fiscal year 2023.

176. Agilon's revenues, gross profits, medical margin, and adjusted EBITDA were all false and misleading. Defendants artificially inflated the Company's 2024 RAF scores as detailed herein, and this caused Agilon's reported revenues (and related financial metrics such as gross profits, medical margin, and EBITDA) to be artificially inflated by at least $37 million, as the Company disclosed in its press release dated August 4, 2025. Further, Agilon hadn't taken the "strategic actions" to "reduce our underwriting risks, improve our platform capabilities, and maintain cost discipline" listed in the press release as the causes "driving long-term sustainable financial performance." Rather, the Company's reported financial performance was based, at least in material part, on RAF inflation in violation of CMS regulations, and therefore was not "long-term" or "sustainable" if the government cracked down on improper medical coding such as it eventually did.

177. Agilon's February 25, 2025 press release also contained an estimated full-year 2025 medical margin of between $275 and $325 million and estimated full-year 2025 adjusted EBITDA of a loss of $55 to $95 million.

178. In truth, Defendants knew, but failed to disclose, that these estimates were reliant upon Agilon's improper and artificial inflation of RAF scores in 2024, contrary to CMS regulations. Such business practices could (and did) get shut down by federal regulators. Largely due to a reduction of its RAF estimates for 2024 and 2025, Agilon would report negative medical margin of $57 million for 2025 and an adjusted EBITDA loss of $296 million in 2025.

179. After Agilon issued the February 25, 2025 press release, the Company hosted an analyst conference call in which Defendants Sell and Schwaneke participated. Sell and Schwaneke repeated the false and misleading financial information contained in the Company's February 25,

2025 press release, which was false and misleading for the same reasons stated above.

180. In the conference call, Defendants utilized a slide-deck filed with the SEC as an exhibit to a Form 8-k signed by Defendant Schwaneke. Slide 8 detailed the Company's 2025 medical margin guidance demonstrating how Agilon would improve on its (false and misleading) 2024 medical margin of $205 million to an estimated guide (the mid-point of the range) of $300 million. The slide called for a "2% RAF improvement net of 2nd year of V28 phase-in."

181. Slide 8 was false and misleading. As Defendants knew, the V28 changes to the HCC codes were intended to, and would, reduce RAF but for the fact that Agilon was at that time and in the past improperly coding patients' medical diagnoses to inflate RAF scores. Calling for a 2% increase in risk adjustment factor (RAF) revenue, after factoring in the V28 changes to HCC codes, was therefore false and misleading for failing to disclose to investors that Agilon's means of achieving prior and current RAF scores was not sustainable.

182. The conference call slide deck also stated on Slide 3: "Strategic actions combined with cost discipline to help drive near-term improvement and sustainable long-term profitability."

183. In addition, during the conference call Defendant Schwaneke misleadingly claimed Agilon had "improved our back-end processes and data and analytics capabilities designed to enhance our visibility and reduce volatility around risk adjustment and medical costs."

184. In truth, it was misleading to assert Agilon had improved the Company's processes and capabilities in any way to "reduce volatility around risk adjustment" without also disclosing that the Company had purposefully pressured medical coders to improperly code diagnoses to artificially inflate risk adjustment factor (RAF) scores in a way that would ultimately lead to increased volatility when federal regulators threatened to eliminate such improper coding for failure to comply with CMS guidelines.

185. On February 25, 2025, Agilon also filed a Form 10-K for the year 2024 (the "2024 Form 10-K) with the SEC, which was signed by Defendants Sell and Schwaneke. The 2024 Form 10-K repeated the false and misleading financial information contained in the Company's February 25, 2025 press release.

186. The 2024 Form 10-K contained additional false and misleading statements regarding Agilon's business practices. For example, the 2024 Form 10-K purported to warn investors of the risks associated with improper coding to Agilon's business, but in fact misstated those risks. The 2024 Form 10-K stated:

> The government may deem entities to have "caused" the submission of false or fraudulent claims by, for example, providing inaccurate billing or coding information, billing for services not rendered, billing services at a higher payment rate than appropriate and billing for care that is not considered medically necessary. . . .
>
> Some government healthcare programs, including, but not limited to, the MA program, use a risk-adjustment model that adjusts premiums paid to contracted payors to reflect the specific characteristics of each enrolled member (including demographics, government program eligibility and health status). Many payors and government healthcare programs have set forth specific documentation rules that must be followed in compliantly selecting allowable codes. ***We rely on physician partners to follow the CMS documentation rules and code their claim submissions with accurate and substantially documented diagnoses***, ***which we send to the payors***, some of whom, in turn, submit the data to government healthcare agencies including CMS.
>
> In recent years, the DOJ has brought a number of investigations and actions under the FCA against ***both payors and providers for alleged upcoding or improper coding of diagnosis coding under the risk-adjustment methodology***.

187. Defendants' purported risk warning about the potential for a FCA or False Claims Act prosecution was false and misleading. Agilon falsely stated that it simply acted as a middle man between physician partners (providers) and payors in conveying coding data, without playing a significant subjective role in altering the diagnosis coding under the risk-adjustment methodology. As detailed herein by the Company's own coders and auditors, Agilon did not merely "rely on the physician partners to follow CMS documentation rules" and then "send to the

payors" that data. Rather, Defendants encouraged Agilon's medical coders to themselves improperly code to purposefully increase patient RAF scores. Accordingly, Agilon – not just the payors and providers – faced real risk from any improper RAF scoring. In the face of heightened government scrutiny, Agilon would be forced to discontinue these practices and reverse prior improper RAF coding.

188. Similarly, the 2024 Form 10-K provided investors with this misleading warning about Agilon's risk related to RAF scoring:

> ***Our estimates of our members' risk adjustment factors, medical services expense, incurred but not reported claims, and earnings pursuant to payor contracts could be inaccurate***.
>
> Medical services revenue related to our members is ***based on clinical disease conditions identified and documented by physicians*** during patient visits during the preceding calendar year, as well as other factors such as the age and gender of the member, which is summarized in a risk-adjustment factor assigned to each member. To estimate the related amount of revenue that will ultimately be realized for the periods presented, we estimate our members' risk adjustment factors based on our knowledge of members' health status, which is in turn ***based on physicians' clinical assessment and documentation of members' health status***, existing risk adjustment factors and applicable Medicare guidelines. These factors may not be predictive of our members' risk adjustment factors, or we may otherwise fail to accurately estimate such score, ***which could cause our revenue estimates for the relevant or forecasted periods to be inaccurate***.

(emphasis in original and added)

189. Defendants' purported risk warning about the potential for "estimates of our members' risk adjustment factors" being inaccurate and therefore leading to "revenue estimates for the relevant or forecasted periods to be inaccurate" were highly misleading because Defendants falsely assured investors that risk adjustment factors were "based on clinical disease conditions ***identified and documented by physicians***" and " based on ***physicians' clinical assessment and documentation***." In truth, Defendants caused Agilon medical coders to use their own subjective assessments of medical records to inflate patient RAF scores even where the physicians had not

documented disease conditions.

190. Similarly, the 2024 Form 10-K misleadingly warned investors that ***hypothetical*** errors in coding could cause Agilon to not receive adequate medical services revenue to cover healthcare services to members, or cause errors in Agilon's estimated medical services revenue.

> The accurate and complete coding and documentation of diagnosis data underlying our members' existing disease conditions is important because our contracts with payors require the submission of complete and correct encounter data. Such data includes members' medical information, as documented by physicians, other medical professionals and hospitals, and is used by payors to attribute membership and reimburse healthcare providers for the services rendered. The accurate and complete coding and documentation of diagnosis is also important because the CMS risk adjustment model adjusts reimbursement for members with existing qualifying diagnoses. Additionally, in geographies in which payors adjudicate claim payments to the provider network, we rely on providers to submit accurate diagnosis information and other encounter data to payors. ***To the extent we or providers in our network fail to submit diagnosis data underlying our members' existing disease condition, we may receive less medical services revenue than is necessary to provide healthcare services for such members***. Furthermore, we project our medical services revenue in part based upon the data submitted and expected to be submitted to CMS. Failure by us or our provider network to submit complete and accurate diagnosis information or encounter data ***may result in inaccuracies in our projections of medical services revenue***, or in other estimation processes.

191. Defendants' purported risk warning about hypothetical errors in coding causing a shortfall of medical services revenue was misleading because, as Defendants knew, Agilon had been improperly coding in violation of CMS guidelines to increase RAF scores and inflate medical services revenue in a manner that was unsustainable if federal regulators threatened to audit Agilon's practices.

192. Agilon's 2024 Form 10-K also falsely assured investors that Agilon's medical coding practices were in compliance with applicable laws and regulations.

> The DOJ has brought a number of investigations and actions under the federal FCA against both physicians and payors, including MA plans, for alleged falsification of diagnosis codes under the risk-adjustment methodology. The Medicare Risk Adjustment Factor ("RAF") scores attributable to members determine, in part, the revenue to which health plans and, in turn, we are entitled for the provision of medical care to such members. The data submitted to CMS by each health plan is based, in part, on medical charts and

> diagnosis codes submitted to health plans. Each health plan generally relies on us and our physician partners to maintain accurate medical records and appropriately document clinical diagnoses associated with medical services provided to members. ***If our physician partners have provided incorrect or incomplete documentation or selected inaccurate reimbursement codes, or if our internal compliance and monitoring systems fail to ensure that documentation is complete and accurate***, ***we could be subject to potential civil and criminal penalties***, including exclusion from government healthcare programs, such as Medicare, that constitute a substantial percentage of our total revenues. Furthermore, in some proceedings involving MA plans, there have been allegations that certain financial arrangements with providers violate other fraud and abuse laws, such as the federal Anti-Kickback Statute. While ***we believe that our data recordation practices and relationships with providers comply with applicable laws and regulations***, such arrangements may be subject to audits, reviews and investigation, and the government may disagree with our position. Furthermore, an audit, review or investigation may result in substantial costs and may divert management's attention and resources.

193. Defendants did not "believe that our data recordation practices and relationships with providers comply with applicable laws and regulations" as Defendants knew and or were reckless in not knowing that Agilon had purposefully caused its medical coders to improperly code for higher RAF scores in violation of applicable laws and regulations. Accordingly, it was misleading for Agilon to warn investors of hypothetical failures to "ensure that documentation is complete and accurate" when Defendants knew or recklessly disregarded that such failures were already occurring.

194. The 2024 Form 10-K also asserted: "Risk adjustment-related revenues are estimated using the most likely amount methodology and amounts are ***only included in revenue to the extent that it is probable that a significant reversal of cumulative revenue will not occur*** once any uncertainty is resolved."

195. Defendants' statement that Agilon only recognizes RAF revenues if it is probable that a significant reversal of revenue will not occur was misleading. Agilon did reverse $85 million of RAF revenue, as announced on August 4, 2025. Agilon recognized RAF revenue from improper medical coding practices implemented to artificially inflate revenue. This RAF revenue was

subject to reversal because federal regulators threatened to implement broader audit standards, including potential audits of Agilon. Agilon had recognized this RAF revenue contrary to the Company's own publicly stated accounting standards that required RAF revenue could only be recognized when uncertainty around a potential reversal was resolved.

196. Prior to the Class Period, Agilon disclosed it had internal controls issues over financial reporting, including RAF revenue. Agilon's 2024 Form 10-K, which was published at the beginning of the Class Period, also falsely and/or misleadingly disclosed that Agilon no longer had any such internal control deficiencies – as determined by Defendants Sell and Schwaneke. The 2024 Form 10-K stated:

> We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in the reports that we file or submit under the Exchange Act, is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required financial disclosure.
>
> As of December 31, 2024, our management, under the supervision and with the participation of our principal executive officer and principal financial officer, evaluated the effectiveness of our disclosure controls and procedures pursuant to Exchange Act Rule 13a-15(e) and 15d-15(e). ***Based upon this evaluation, as of December 31, 2024, our principal executive officer and principal financial officer concluded that our disclosure controls and procedures were effective*** at the reasonable assurance level.

197. Agilon's CEO and CFO, Defendants Sell and Schwaneke, had personally been responsible for addressing the prior internal controls deficits that concerned, among other things, reporting of RAF revenue.

> As previously reported in our Annual Report on Form 10-K for the year ended December 31, 2023 filed with the SEC, management identified a material weakness in internal control over financial reporting. The material weakness that was previously identified related to the following:
>
> - Management identified a material weakness in controls related to the completeness and accuracy of information produced by the entity (IPE) and the

level of precision and documentation around its management review controls to address the IPE for medical claims and related payables, ***risk adjusted premium revenue*** and certain care management expenses.

Management has been actively engaged in remediating the above-described material weakness.

198. Defendants' statements that they had remediated internal controls over risk adjusted premium revenue were false and misleading because, as is detailed herein, Agilon purposefully inflated RAF revenue by improperly coding patients' medical diagnoses in violation of federal regulations. Agilon's internal auditors repeatedly documented medical coders' infractions in internal spreadsheets provided to Agilon's internal control team and yet Agilon did not put an end to the practice to prevent the improper practices from artificially inflating Agilon's publicly reported financial metrics.

199. On March 5, 2025, Defendants Sell and Schwaneke presented at the TD Cowen Healthcare Conference. Defendants again falsely assured investors the Company could grow RAF revenue by 2% despite V28 restrictions to HCC codes.

Ryan Langston
*Analyst, TD Cowen*

Got it. Jeff, on 2025 guidance, obviously you guys give a good amount of information and I appreciate the way you lay it out in your presentations. I think it's easy to understand. But maybe just give us, not all the pieces, but maybe sort of in those swing factors. Where do you have maybe – I'll say conservatism built in, maybe some – I don't want to say not so conservative, but some of those biggest swing factors that can help you get to that guidance that you kind of laid out in 2025?

Jeffrey A. Schwaneke
*Chief Financial Officer, Agilon Health, Inc.*

Yeah. Certainly. So I think that, just broadly, I would say we have roughly a 4% growth in revenue, really driven by 2% coming from the bids and initiatives ***and then another 2% net of risk adjustment and that's after the impact of v28.*** And so as you think broadly, you have a 4% increase in revenue and then we have a cost trend assumption of 5.3%. And so part of what is offsetting that spread or the exits that we had in 2024, which substantially improved the profitability of the business. And so as I look at the swing

> factors, obviously medical cost trends would be the largest. And our view on 5.3% is really it's on par with what we experienced in 2024. And so we ended 2024 at 6.8%. There was 50 basis points associated with the two-midnight rule. And then we had the payer bid changes, which we've talked a little bit about here, which was really a cost shift to the members. And so our view is that cost trend is kind of equivalent to what 2024 was at a continued elevated rate. And so as I think about the variability, it's really on the medical cost trend side. And to the extent trends are lower, obviously that would that would flow through our P&L.

200. Defendant Schwaneke's statement was misleading. As Defendants knew, the V28 changes to the HCC codes were intended to, and would, reduce RAF but for the fact that Agilon was at that time and in the past improperly coding patients' medical diagnoses to inflate RAF scores. Calling for a 2% increase in risk adjustment factor (RAF) revenue, after factoring in the V28 changes to HCC codes, was therefore false and misleading for failing to disclose to investors that Agilon's means of achieving prior and current RAF scores was not sustainable.

201. On May 6, 2025, after market close, Agilon issued a press release entitled "agilon health Reports First Quarter 2025 Results." The press release quoted Defendant Sell stating: "We remain focused on our strategic long-term growth priorities supported by investments in technology and clinical programs to drive increased value for our partners, members, and shareholders."

202. The May 6, 2025 press release also provided financial metrics, all of which were falsely manipulated by the Company's inflated RAF scores for 2025. The press release stated:

- Total revenue of $1.53 billion in the first quarter 2025 decreased 4% compared to $1.60 billion in the first quarter 2024. Revenue reflects membership growth in new markets and same geography growth more than offset by the impact from market exits.

- Gross profit of $51 million in the first quarter 2025 compared to $75 million in the first quarter 2024. Net income of $12 million in the first quarter 2025 compared to net loss of $6 million in the first quarter 2024.

- Medical margin of $128 million during the first quarter 2025, compared to $157

million in the first quarter 2024. Medical Margin for the first quarter 2025 included a negative $22 million net impact from prior year claims including $7 million from exited markets. The first quarter 2024 included a negative $9 million net impact from prior year claims.

- Adjusted EBITDA of $21 million in the first quarter 2025 compared to $29 million in the first quarter 2024.

203. Agilon's revenues, gross profits, medical margin, and adjusted EBITDA were all false and misleading. Defendants artificially inflated the Company's 2025 RAF scores as detailed herein, and this caused Agilon's reported revenues (and related financial metrics such as gross profits, medical margin, and EBITDA) to be artificially inflated by $48 million in the first half of 2025, as the Company disclosed in its press release dated August 4, 2025. Further, it was misleading to claim that "investments in technology and clinical programs" were driving increased value without disclosing the Company's reported financial performance was based, at least in material part, on RAF inflation in violation of CMS regulations, and therefore was not sustainable if the government cracked down on improper medical coding as it eventually did.

204. In the May 6, 2025 press release, Defendants reaffirmed 2025 earnings guidance and provided detailed guidance on a number of metrics (including total revenues and adjusted EBITDA) for the second quarter and full year. Medical margin guidance was for $50 to $70 million for the second quarter of 2025, and full year medical margin guidance was for $275 to $325 million for the full year. Adjusted EBITDA guidance was for a loss of $35 to $20 million in the second quarter and a loss of $95 million to $55 million for the year.

205. In truth, Defendants knew, but failed to disclose, that these estimates were reliant upon Agilon's improper and artificial inflation of RAF scores in 2024 and 2025, contrary to CMS regulations. Such business practices could (and did) get shut down by federal regulators. Largely due to a reduction of its RAF estimates for 2024 and 2025, Agilon would report negative medical

margin of $53 million for the second quarter of 2025 and a negative $57 million for full year 2025. Agilon would report an adjusted EBITDA loss of $83 million for the second quarter of 2025, and an adjusted EBITDA loss of $296 million for full year 2025.

206. After Agilon issued the May 6, 2025 press release, the Company hosted an analyst conference call in which Defendants Sell and Schwaneke participated. Sell and Schwaneke repeated the false and misleading financial information contained in the Company's May 6, 2025 press release, which was false and misleading for the same reasons stated above.

207. Defendant Schwaneke also repeated the Company's estimates for the second quarter and the full year, without disclosing that these estimates were based on then-existing manipulation of covered patients' RAF scores and falsely attributing the financial metrics to other causes:

> ***For the second quarter, medical margin is expected to be between $50 million and $70 million and full year medical margins are projected to be between $275 million to $325 million, driven by targeted initiatives in our BOI program, clinical initiatives, and operating performance***. As a reminder, the class of 2025 will have a lower revenue and margin PMPM due to our measured glide path approach mentioned last quarter. ***Second quarter 2025 adjusted EBITDA is expected to be between negative $35 million to negative $20 million.***
>
> ***Our full year 2025 adjusted EBITDA guidance range remains unchanged at negative $95 million to negative $55 million, consistent with our plan to achieve financial stability while investing in long-term growth.*** . . .
>
> In summary, while we continue to operate in a challenging environment, ***the actions we are taking to refine our strategy, improve operational execution and financial visibility, and strengthen our financial position are evident in our first quarter performance***. We remain confident in our ability to navigate the near-term headwinds and to position agilon for long-term success.

208. During the conference call, Defendants were asked about the impact of V28 on the Company's business.

**Stephen Baxter**

I guess maybe starting with a bigger picture one. Obviously, there's been a lot of focus on the impact of the V-28 risk model transition on value based care companies for this quarter in particular and whether there's anything about the transition that's proving potentially more difficult than might have been expected for various reasons.

So I think it'd probably be helpful if you could just give us a quick update, I guess, on the company's thinking around V-28, the impact specifically on 2025 and whether there's anything different to consider relative to the impact you faced in 2024? And then whether there's anything to think about from here in terms of expectations for the pacing of the remainder of the V-28 Basin? Thank you.

**Steve Sell**

Sure, Stephen. Thanks for the question. ***I think the headline is that from a risk adjustment perspective in 2025, we're in line with our expectations, 2% net increase year over year inclusive of about a 3% headwind from V-28.*** I think a couple of things to consider, as you think about our model is, one, the continuity that our primary care physicians have with their patients. Our patients have been with their PCPs on average for ten plus years. Each year, they're doing annual wellness visit assessments with them. And ***so we were able to really do that work in 2024 that's reflected in what we're expecting for '25 paid***.

The second is that, as I called out in my prepared remarks, our membership in '25 is essentially the membership we had in '24. It's really part of our disciplined growth. It obviously is net of those payer and partnership exits that we've talked about previously. And so ***I think the takeaway overall, it's in line with our expectation***. We did the work last year to really reflect that. It's early, but we're encouraged by what we're seeing.

209. Defendant Sell's statements were false and misleading regarding V28 and the Company's risk adjustment factor. As Defendants knew, the V28 changes to the HCC codes were intended to, and would, reduce RAF but for the fact that Agilon was at that time and in the past improperly coding patients' medical diagnoses to inflate RAF scores. Calling for a 2% increase in risk adjustment factor (RAF) revenue, after factoring in the V28 changes to HCC codes, was therefore false and misleading for failing to disclose to investors that Agilon's means of achieving prior and current RAF scores was not sustainable.

210. In the conference call, Defendants utilized a slide-deck which stated: "Strategic actions combined with cost discipline to help drive near-term improvement and sustainable long-term profitability."

211. The slide deck also included slides explaining how Agilon estimated its 2025 medical margin and adjusted EBITDA, without disclosing the Company's RAF manipulation.

212. Defendants' statements were false and misleading in that Defendants failed to disclose the Company's financial profitability, medical margin, and adjusted EBITDA were highly dependent on the manipulation of RAF in contradiction of CMS guidelines and therefore were not sustainable and at great risk if the government threatened to audit Agilon's RAF estimates.

213. On May 6, 2025, Agilon also filed a Form 10-Q for the first quarter of 2025 (the "1Q Form 10-Q") with the SEC, which was signed by Defendant Schwaneke. Defendant Sell provided two sworn certifications attesting to the accuracy of the 1Q Form 10-Q. The 1Q Form 10-Q repeated the false and misleading financial information contained in the Company's May 6, 2025 press release.

214. On May 14, 2025, Defendants Sell and Schwaneke spoke at the Bank of America Healthcare Conference. Defendant Sell specifically reassured investors about Agilon's RAF scoring. Agilon partnered with primary care physicians (or PCPs) that maintained long term relationships with their patients, thus enabling Agilon to have good visibility as to the RAF for each patient.

> [S]o what we've done is created a long-term exclusive partnership with primary care physicians who sit in scaled groups. Groups have been in their communities for decades, and they have a long-term relationship with their patients. So our PCP's have on average a 10 year plus relationship with their patients. And what we do is we move those physicians, their patients and their health plans from fee-for-service for the senior population into global risk in which they manage that total cost care and quality. And so that's what we think is really the differentiator, the partnership and then the long-term relationship between the PCP and the patient.
>
> * * *
>
> But I think what's important is this long-term relationship with the patient and physician. And so, part of it is we look at 2025, an important data point we shared on our earnings call last week is we basically have ***the exact same patient base in 2025 than we had in***

> ***2024***. They've been with their physician for a long time. They've been doing the work in 2024 in terms of wellness visits and managing their complex conditions. ***And so that sets a baseline for us as we move into 2025***. ***And that continuity helps to give us comfort around risk scores and around trends***.

215. Defendants' statements about their "comfort around risk scores" and the reasons for why Defendants were comfortable with Agilon's RAF scores were misleading in that Defendants failed to disclose that Agilon purposefully coded RAF scores improperly to maximize RAF revenue contrary to federal regulations and CMS guidelines regarding proper medical coding practices.

216. On May 28, 2025, Defendants Sell and Schwaneke spoke at the Bernstein Strategic Decisions Conference. When asked about the Company's risk adjustment scoring process, and the impact of V28, Defendant Sell emphasized that Agilon's business model was succeeding because Agilon intervened early to identify and diagnose patients with chronic disease and then treat them before they needed expensive medical care, without disclosing that Agilon had been improperly diagnosing patients to artificially inflate RAF scores. Defendant Sell again asserted that Agilon's RAF revenue would increase in 2025 by 2%, despite V28, without disclosing that Agilon was artificially inflating RAF revenue in violation of federal regulations.

> Question – Lance Wilkes: Yeah. So, let me hit one of the other topics, it's front page for everybody right now which is just ***risk adjustment*** and maybe we will flow right into kind of the current environment utilization and whatnot because you got top line and medical cost there. ***From a risk adjustment standpoint, could you talk a little bit about your risk adjustment process***, how you go about it, maybe kind of the credibility that is within that process? And then think about the [V]28, what are the implications? What have been the impacts of that to you? And then maybe how have the results differed from what your expectations were there?
>
> * * *
>
> Answer – Steven J. Sell: So – and Jeff is so well-versed in this, so you should chime in. But, I mean, it always starts with the strength of the PCP patient relationship. And I think if I step back and look at V28 and RADV audits, I think it's pushing the world towards that and the importance of it. ***Philosophically, risk adjustment or as we call it our Burden of***

> ***Illness program, is sort of the foundation of our clinical model. And the early assessment and diagnosis is then managed is matched up with care plans to manage really chronic diseases and ultimately prevent or delay the progression of the disease and people unnecessarily ending up in the inpatient or ER setting***.
>
> So, it's – we call it our BOI as a clinical program. It's really at the heart of everything we do. So that philosophy kind of permeates everything we do. I think as we look at V28, when it's done, we think it's a more clinical world. And so, if you look at the policy logic, I think it's to say the largest chronic diseases that are driving the majority of inpatient ER utilization, congestive heart failure, COPD, dementia, cancer, those are the things that we want primary care physicians identifying and preventing people from an acute event in the ER inpatient setting.
>
> And so that – that's a big part of what we do in our Burden of Illness program, the RADV audits, as you expand those audits out, again, I think it pushes towards reinforcing. People have a really pristine process around that. ***So, we have 100% chart review process. We have a clinical – pure medical record review process. We have a process that requires suspected conditions to be matched with data and evidence around that. All of that, I think, is where the world is intended to go and what people are trying to structure around that***.
>
> So, I think for us, we believe, again, the risk adjustment world is kind of moving towards what we do and we'll reinforce that there are big changes, right? So, V28 running, this is the third year now, side-by-side V24, V28 there's a lot of logistics and operations within that. The headwind that you have to come over this year, ***it's a net 2% increase in risk adjustment*** that's overcoming probably a 3% headwind. So, call it a gross 5% to get to a net 2%, that's a lot. And running those two side-by-side was maybe a little bit more complicated than we realized. But now you're – it's 100%, you're here. ***It's all that you're focused on and really getting those appropriate diagnoses and thinking about it as a clinical program is kind of the heart.***

217. Defendants' above statements were false and misleading. Agilon wasn't merely focused on "getting those appropriate diagnoses" but was artificially inflating RAF by improperly coding diagnoses that were not supported by the documentation in the medical charts. Further, Agilon's "100% chart review process" or "medical record review process" was not a process "that requires suspected conditions to be matched with data and evidence" but was rather a process by which Agilon aggressively coded diagnoses not supported by the documentation in the medical charts. Further, Defendant Sell's statements were false and misleading regarding V28 and the Company's risk adjustment factor. As Defendants knew, the V28 changes to the HCC codes were

intended to, and would, reduce RAF but for the fact that Agilon was at that time and in the past improperly coding patients' medical diagnoses to inflate RAF scores. Calling for a 2% increase in risk adjustment factor (RAF) revenue, after factoring in the V28 changes to HCC codes, was therefore false and misleading for failing to disclose to investors that Agilon's means of achieving prior and current RAF scores was not sustainable.

## VI. LOSS CAUSATION

218. Defendants, as alleged herein, directly and proximately caused Plaintiffs' and Class members' economic loss. During the Class Period, Defendants engaged in a scheme and wrongful course of business conduct that was designed to inflate the Company's stock price by artificially inflating Agilon's publicly reported revenue (and associated financial metrics including medical margin and adjusted EBITDA) by improperly coding medical conditions to increase patient RAF scores and thus revenues received for MA patients, without disclosing material facts necessary to render those statements not false or misleading. Agilon's shares traded at artificially inflated prices as a direct result of Defendants' materially false and misleading statements, and concealment of the relevant truth about Defendants' fraudulent scheme. Plaintiffs and other Class members purchased Agilon shares at artificially inflated prices and suffered damages when Agilon's share price declined as the relevant truth entered the market.

219. On August 4, 2025, Agilon issued two press releases after the market closed. One press release was titled "agilon health Announces Leadership Transition." This press release stated that Defendant Sell "has stepped down as President, CEO, and a Director of the Board. Ronald A. Williams, the Company's co-founder and Board Chairman since 2017, has been appointed Executive Chairman. Williams is an industry veteran with leadership experience at healthcare and technology companies including Aetna, where he was Chairman and CEO."

220. Defendant Sell was forced out of the Company as result of the misconduct alleged herein.

221. Separately on August 4, 2025, Agilon issued a press release entitled "agilon health reports Second Quarter 2025 results." The press release revealed that Agilon's 2024 and 2025 risk adjustment revenue would be lower than previously expected, which was impacting the Company's financial results.

222. Critically, the August 4, 2025 press release confirmed that Agilon had inflated its RAF revenue in fiscal year 2024 ***and*** in 2025 by $85 million. The press release stated Agilon would take "***a $37 million reduction in risk adjustment revenue for 2024***" and "***a reduction in risk adjustment revenue of $48 million year-to-date for 2025***[.]"

223. Though the $85 million RAF overstatement was attributable to earlier 2024 and 2025 financial reporting periods, Agilon did not formally restate financial results for the prior periods but took the entire $85 million RAF reduction in the second quarter of 2025. Accordingly, Agilon's reductions in RAF revenue by $85 million impacted the Company's reported medical margin, gross profit, total revenue, and EBITDA in the second quarter of 2025.

224. Agilon's revised RAF calculations would likewise impact RAF related revenues for the remainder of 2025. Accordingly, the Company was forced to announce that it was suspending its 2025 guidance, stating the following:

> In conjunction with the announcement of agilon's leadership change and the evaluation of additional actions to optimize operating performance, as well as continued execution of ongoing initiatives and market uncertainty which may impact future results, agilon ***is suspending its previously issued full-year 2025 financial guidance and related assumptions.***

225. On August 4, 2025, after market hours, Agilon held its Q2 2025 Earnings Call. During the conference call Defendants utilized a slide deck that demonstrated the Company's

reported medical margin of negative $53 million was far short of the Company's guided medical margin (the mid-point of the range being $60 million) primarily as a result of the $85 million in RAF reduction. Further, as Defendant Schwaneke explained during the call, the reported negative $83 million in adjusted EBITDA was similarly attributable to the Company's $85 million in RAF reduction.

226. On this news, the price of Agilon stock fell from a closing price on August 4, 2025 of $1.815 to close at $0.8801 on August 5, 2025, a decline of $0.9349 per share or 51.50%.

227. Analysts were quick to connect the stock price decline to the Company's simultaneous announcements that Agilon had overstated RAF revenue and fired its CEO. For example, JP Morgan issued an analyst report on August 4, 2025 stating:

> Today after the close, AGL pre-announced 2Q25 results (initially scheduled for tomorrow AMC) that reflected ***continued challenges for the company's valuebased care model***, prompting the withdrawal of FY25 guidance and the departure of Steven Sell, who stepped down as CEO and Director of the Board. Much of the pressure that surfaced in 2Q is ***stemming from lower than expected revenue risk adjustments with AGL absorbing -$85M of negative RAF impacts (-$48M reduction for FY25 YTD risk adjustment revenue, -$37M reduction for FY24)*** as well as -$33M of net unfavorable PYD. MLR in the quarter was negative at 103.8% vs 96.0%/95.8% JPMe/cons, translating to ***medical margins of -$53.2M that missed Street estimates by ~$110M and adj EBITDA of -$83.3M that missed by ~$54M***. Given the magnitude of the YTD risk adjustment and the run rate this implies for the rest of the year, FY25 guidance was withdrawn, which was previously targeting revenues of $5,938M (vs. $5,944M/$5,950M JPMe/cons) and adj EBITDA of -$75M (vs. -$80M/-$79M JPMe/cons) at the midpoint.

228. That same day, Investing.com published an article entitled "agilon health stock plunges after CEO steps down amid earnings miss." The article stated the following, in pertinent part:

> [Agilon stock tumbled] after the company announced CEO Steven Sell has stepped down and the firm reported disappointing second quarter results that fell short of expectations.

* * *

> The leadership change [as discussed above], coincided with concerning financial results for the second quarter of 2025. Total revenue decreased 6% to $1.39 billion compared to $1.48 billion in the same period last year. The company reported a gross loss of $52 million, a significant deterioration from the $32 million profit in Q2 2024.
>
> Medical margin swung to a negative $53 million from a positive $106 million YoY, while adjusted EBITDA loss widened to $83 million compared to a $3 million loss in the prior-year period.
>
> The company cited several factors for the disappointing performance, including $66 million in prior period development costs and a $48 million reduction in risk adjustment revenue for 2025.

229. On August 15, 2025, Jeffries issued an analyst report titled "Fundamental Struggles Continue, But Sense of Urgency is Clear for AGL" which stated:

> What Happened: CEO Out, Guidance Pulled, PYD Issues Persist. With their 2Q results, AGL announced a leadership transition with Steve Sell stepping down as CEO/board member & Ron Williams (ex-Aetna CEO) appointed as Exec. Chairman. The company will conduct a search for a new CEO, & Williams will head an Office of the Chairman overseeing operations on an interim basis. The large 2Q miss & withdrawal of guidance were driven by a familiar issue for AGL: prior-period development. The development represented a $115MM headwind to Medical Margin compared to a prior $300MM FY25 Med Margin guidance midpt and comprised a $67MM headwind from PYD and a $48MM true-up on in-year Risk Adjustment reflective of 72% of AGL's members.

230. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiffs and the other Class members have suffered significant losses and damages.

## VII. <u>ADDITIONAL SCIENTER ALLEGATIONS</u>

231. Defendants Sell and Schwaneke closely monitored Agilon's internal controls over financial reporting, particularly as they concerned RAF. Prior to the Class Period, on February 27, 2024, Agilon's accounting firm Ernst & Young LLP and Agilon admitted that Agilon's internal controls over RAF suffered from a material weakness. During 2024, Defendants Sell and Schwaneke had specific responsibility to address this concern. According to FE-2, Agilon's

internal audits of medical coders were recorded in spreadsheets provided to Agilon's internal controls department. As such, Defendants Sell and Schwaneke either knew or recklessly disregarded direct evidence that Agilon's coders were improperly coding to increase RAF.

232. Agilon filed its Form 10-K for the year 2023 on February 27, 2024 (the "2023 Form 10-K"). The 2023 Form 10-K revealed that as of December 31, 2023, Agilon had a material weakness in its internal controls. The 2023 Form 10-K stated:

> As of December 31, 2023, our management, under the supervision and with the participation of our principal executive officer and principal financial officer, evaluated the effectiveness of our disclosure controls and procedures pursuant to Exchange Act Rule 13a-15(e) and 15d-15(e). Based upon this evaluation, as of December 31, 2023, our principal executive officer and principal financial officer concluded that our disclosure controls and procedures were not effective as a result of a material weakness in our internal control over financial reporting discussed below.
>
> * * *
>
> Management has identified a material weakness in controls related to the completeness and accuracy of information produced by the entity (IPE) and the level of precision and documentation around its management review controls to address the IPE for medical claims and related payables, ***risk adjusted premium revenue*** and certain care management expenses.

233. The 2023 Form 10-K further reassured investors that Agilon's management would take personal responsibility to fix these internal control problems:

> Designing and implementing ***specific management review procedures*** to ensure completeness and accuracy of key financial and non-financial data utilized in the recognition of medical claims and related payables, ***risk adjusted premium revenue*** and care management expenses

234. Agilon's 2024 Form 10-K, which was published at the beginning of the Class Period, disclosed that Agilon no longer had any such internal control deficiencies – as determined by Defendants Sell and Schwaneke.

> We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in the reports that we file or submit under the Exchange Act, is recorded, processed, summarized and reported within the time periods

> specified in the SEC's rules and forms and that such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required financial disclosure.
>
> As of December 31, 2024, our management, under the supervision and with the participation of our principal executive officer and principal financial officer, evaluated the effectiveness of our disclosure controls and procedures pursuant to Exchange Act Rule 13a-15(e) and 15d-15(e). ***Based upon this evaluation, as of December 31, 2024, our principal executive officer and principal financial officer concluded that our disclosure controls and procedures were effective*** at the reasonable assurance level.

235. Agilon's CEO and CFO, Defendants Sell and Schwaneke, had personally been responsible for addressing the prior internal controls deficits that concerned, among other things, reporting of RAF revenue.

> As previously reported in our Annual Report on Form 10-K for the year ended December 31, 2023 filed with the SEC, management identified a material weakness in internal control over financial reporting. The material weakness that was previously identified related to the following:
>
> - Management identified a material weakness in controls related to the completeness and accuracy of information produced by the entity (IPE) and the level of precision and documentation around its management review controls to address the IPE for medical claims and related payables, ***risk adjusted premium revenue*** and certain care management expenses.
>
> Management has been actively engaged in remediating the above-described material weakness.

236. According to FE-2, Agilon's auditors documented in spreadsheets results of coder audits, and provided these spreadsheets to Agilon's internal controls team, and FE-2 believed the CEO and CFO knew about these issues.

237. As Defendants Sell and Schwaneke were personally engaged in and responsible for fixing and monitoring internal controls over RAF reporting, and certified that the internal controls over RAF reporting were appropriate, it would be unreasonable to infer Defendants Sell and Schwaneke were unaware of Agilon's intentionally improper medical coding practices

implemented to maximize RAF revenue rather than accurately record patient diagnoses in accordance with federal regulations and CMS guidelines.

238. Further, Defendants were motivated to artificially increase RAF and RAF revenue to achieve bonus targets related to adjusted EBITDA and medical margin. According to Agilon's 2025 proxy statement filed with the SEC in April 2025:

> For the 2024 Fiscal Year, each NEO [Named Executive Officer] had a target incentive opportunity equal to 75% of his base salary for the year. The maximum annual incentive payout for each NEO is 150% of the NEO's target opportunity. ***For the 2024 Fiscal Year, our performance metrics included Adjusted EBITDA (weighted at 55%)***, year-end membership on the agilon platform in existing markets (weighted at 5%), new market membership growth (weighted at 10%), experience by measure of percent of Gaps Closed* and primary care physician ("PCP") touchpoints (weighted at 10% in the aggregate), quality by measure of chronic condition reassessment rates which represents care reassessments and acknowledgement rates that are blended across markets (weighted at 10%), and team & culture (weighted at 10%). Threshold, target and stretch (i.e., maximum) goals were set for each metric, and the payout percentage for each metric was determined by interpolation for performance results between such levels***. In addition, a modifier of +/- 15% (which would adjust, up or down, the incentive otherwise payable) based on our medical margins was added***. In addition, final payouts for each NEO considered individual performance during the year. The Compensation and Human Capital Committee selected these metrics for our annual incentive compensation program as it believes they are key drivers of our short-term financial and operational success that will benefit shareholders if achieved at or above target. ***The increased weighting on Adjusted EBITDA and the addition of the medical margin modifier were to emphasize delivering profitable results.***

239. Agilon's 2024 incentive-based pay metrics are relevant to Defendants' Class Period statements in 2025 because, as detailed herein, Agilon overstated RAF revenue in both 2024 and 2025, thereby making statements in 2025 false and misleading.

240. In addition to incentive-based pay, in April 2025 Defendant Sell received $2.25 million in Annual RSUs and $2.25 million in Annual Stock Options. He also received a Transformational Award of $1.8 million in PSUs linked to adjusted EBITDA.

241. In addition to incentive-based pay, in April 2025 Defendant Schwaneke received $1.75 million in Annual RSUs and $1.75 million in Annual Stock Options. He also received a

Transformational Award of $1.2 million in PSUs linked to adjusted EBITDA.

242. Agilon is a novel business with an unproven business model. Defendants' incentive-based pay metrics were designed by the Board of Directors to "emphasize delivering profitable results" because Agilon was a deeply unprofitable company in the years leading up to the Class Period. Agilon lost $106.6 million in 2022, lost $262.6 million in 2023, and lost $260.2 million in 2024. Agilon's share price had dropped significantly. As set forth in the Company's SEC filings, whereas $100 invested in the S&P 500 on April 15, 2021 was worth $151 on December 31, 2024, an investment of $100 in Agilon on April 15, 2021 was worth only $8 on December 31, 2024. Defendants, who owned significant numbers of Agilon shares, were motivated to increase RAF revenue to prove the Company's business and business model could succeed.

## VIII. PLAINTIFFS' CLASS ACTION ALLEGATIONS

243. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired agilon common stock publicly traded on the NYSE during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

244. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not

thousands of members in the proposed Class.

245. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

246. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

247. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;
- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false filings;
- whether the prices of the Company's common stock during the Class Period was artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

248. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

249. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- the Company's common stock met the requirements for listing, and was listed and actively traded on the NYSE, an efficient market;
- as a public issuer, the Company filed public reports;
- the Company communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;
- the Company's common stock was liquid and traded with moderate to heavy volume during the Class Period; and
- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

250. Based on the foregoing, the market for the Company common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the common stock, and Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

251. Alternatively, Plaintiffs and the members of the Class are entitled to the

presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## IX. CAUSES OF ACTION

### COUNT I
### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against All Defendants

252. Plaintiffs repeats and realleges each and every allegation contained above as if fully set forth herein.

253. This Count asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

254. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

255. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of the Company's common stock during the Class Period.

256. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

257. Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Company's personnel to members of the investing public, including Plaintiffs and the Class.

258. As a result of the foregoing, the market price of the Company's common stock was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's common stock during the Class Period in purchasing the Company's common stock at prices that were artificially inflated as a result of Defendants' false and misleading statements.

259. Had Plaintiffs and the other members of the Class been aware that the market price

of the Company's common stock had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's common stock at the artificially inflated prices that they did, or at all.

260. As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

261. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's common stock during the Class Period.

**COUNT II**
**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

262. Plaintiffs repeat and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

263. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's business practices

264. As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

265. Because of their positions of control and authority as senior executives and/or

directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Company common stock.

266. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## X. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of himself and the Class, prays for judgment and relief as follows:

(a) declaring this action to be a proper class action and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiffs' counsel as Lead Counsel;

(b) awarding damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, together with interest thereon;

(c) awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

## XI. JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: June 29, 2026

**THE ROSEN LAW FIRM, P.A.**

/s/ *Matthew P. Siben*
Phillip Kim, Esq.
Laurence M. Rosen, Esq.
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com
Email: lrosen@rosenlegal.com

Matthew P. Siben
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: msiben@rosenlegal.com

*Counsel for Lead Plaintiff and Additional Plaintiffs Jeremy Vandersluis and Lead Counsel for the Class*

**THE SCHALL LAW FIRM**

Brian Schall, Esq.
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Phone: (310) 301-3335
Fax: (877) 590-0483
Email: brian@schallfirm.com

*Additional Counsel for Lead Plaintiff*

**GLANCY PRONGAY WOLKE & ROTTER LLP**

Gregory B. Linkh (GL-0477)
230 Park Ave., Suite 358
New York, NY 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988

glinkh@glancylaw.com

Robert V. Prongay
Charles H. Linehan
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Counsel for Additional Plaintiff Shaji Nelson*